# EXHIBIT A

Page 1

1            UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF ILLINOIS

3              EAST ST. LOUIS DIVISION

4     KENNETH CRAWFORD, individually

5     and on behalf of all others similarly

6     situated,

7            Plaintiff,

8

9     VS.            Cause No.  3:22-cv-00220-DWD

10

11    ARIZONA BEVERAGES USA, LLC

12           Defendant.

13    ─────────────────────────────────────────

14            VIDEOTAPE DEPOSITION OF

15              KENNETH CRAWFORD

16

17             February 13, 2023

18               10:00 a.m.

19

20              Taken at:

21         Gausnell, O'Keefe & Thomas

22            1717 Park Avenue

23           St. Louis, Missouri

24    Nancy Prange, CCR, CSR

Page 2

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF ILLINOIS
3  EAST ST. LOUIS DIVISION
4
5  KENNETH CRAWFORD, individually
6  and on behalf of all others similarly
7  situated,
8
9       Plaintiff,
10
11 VS.          Cause No.  3:22-cv-00220-DWD
12
13 ARIZONA BEVERAGES USA, LLC
14
15      Defendant.
16
17      Videotape Deposition of KENNETH CRAWFORD,
18 taken on behalf of the Defendant, at the offices of
19 Gausnell, O'Keefe & Thomas, LLC, 1717 Park Avenue,
20 in the City of St. Louis, State of Missouri, on the
21 13th day of February, 2023, before Nancy Prange, CCR
22 MO #778, CSR IL #084-004426, and Notary Public.
23
24

Page 4

1                 INDEX
2                 PAGE
3  Examination by Mr. Donovan          6
4  Examination by Mr. Sheehan          112
5
6               EXHIBITS
7
8  Ex. P-1 Bankruptcy Petition          36
9  Ex. P-2  Attorney Retainer Agreement   45
10 Ex. P-3 Responses and Objections to Requests
11      For Admissions          54
12 Ex. P-4 Answers to Interrogatories      58
13 Ex. P-5  Arnold Palmer 32 oz. Lite Can    67
14 Ex. P-6 Decision by Court          69
15 Ex. P-7 Arnold Palmer not labeled Lite    79
16 Ex. P-8 Arnold Palmer 20 oz. (Golf Ball)
17      Lite Bottle          83
18 Ex. P-9 Arnold Palmer Gallon Jug        88
19 Ex. P-10 The Complaint          91
20 Ex. P-11 Photo of Arnold Palmer 20 oz.
21      Lite Label          93
22 Ex. P-12 Arnold Palmer 20 oz. Lite Bottle   98
23
24

Page 3

1  APPEARANCES OF COUNSEL:
2
3  FOR THE PLAINTIFF:
4  Mr. Spencer Sheehan
5  Sheehan & Associates, PC
6  60 Cuttermill Road, Suite 409
7  Great Neck, NY  11021-3104
8  (516) 268-7080
9  Spencer@spencersheehan.com
10
11 FOR THE DEFENDANT:
12 Mr. Robert P. Donovan
13 Stevens & Lee
14 669 River Drive, Suite 201
15 Elmwood Park, NJ  07407
16 (201) 857-6778
17 robert.donovan@stevenslee.com
18
19 THE VIDEOGRAPHER:
20 Mr. Timothy Perry
21 Veritext Legal Solutions
22 701 Market Street, Suite 310
23 St. Louis, MO  63101
24 (314) 241-6750

Page 5

1      THE VIDEOGRAPHER:  Good morning.  We are on
2  the record at 10:11 on February 13, 2023.  This
3  is media unit one of the Video Recorded
4  Deposition of Kenneth Crawford being taken by
5  counsel for defendants in the matter of Kenneth
6  Crawford versus Arizona Beverages USA, LLC,
7  pending in the cause -- I'm sorry, pending in
8  the United States District Court, Southern
9  District of Illinois, East St. Louis Division,
10 Case Number 3:22-cv-00220.  This deposition is
11 being held at Gausnell, O'Keefe & Thomas
12 located at 1717 Park Avenue in St. Louis,
13 Missouri.  And my name is Tim Perry, Certified
14 Legal Video Specialist, our court reporter is
15 Nancy Prange, we're with Veritext Legal
16 Solutions.  Counsel, will you identify
17 yourselves for the record, please?
18     MR. SHEEHAN:  For the Plaintiff, Spencer
19 Sheehan.
20     MR. DONOVAN:  For the Defendant Robert
21 Donovan.
22     THE VIDEOGRAPHER:  Thank you, both.  Nancy,
23 please swear in the witness.
24     KENNETH CRAWFORD,

2 (Pages 2 - 5)

Page 6

1 of lawful age, having been first duly sworn to
2 testify the truth, the whole truth, and nothing but
3 the truth in the case aforesaid, deposes and says in
4 reply to oral interrogatories propounded as follows,
5 to-wit:
6        EXAMINATION
7 QUESTIONS BY MR. DONOVAN:
8    Q   (By Mr. Donovan) Good morning,
9 Mr. Crawford.
10   A   Good morning.
11   Q   My name is Bob Donovan.  I'm an attorney for
12 the Defendant in this case, and your deposition is
13 proceeding that we're going to be addressing today
14 and I want to give you some basic instructions before
15 we start the questions.  Okay?
16   A   Okay.
17   Q   First of all, is there anything, are you
18 under any medication that would inhibit your ability
19 to answer any questions?
20   A   No.
21   Q   So here are some just basic ground rules.
22 Even though we're in a law office, your testimony
23 would have the same and will have the same
24 evidentiary value as if you were in a court.  So it's

Page 7

1 important for you to listen to my question.  Because
2 if you answer the question, the Court is going to
3 presume that you understood the question.  If you
4 don't understand the question, just let me know and
5 I'll try to be clearer, or ask you what you don't
6 understand about the question.
7        I'll be asking you questions about dates
8 and times and amounts and I'm always interested in
9 reasonable approximations when it comes to all your
10 answers in that way.  There could come a point in
11 time when your attorney, who is seated to your left,
12 may object.  So it's important for you to wait until
13 my question is posed until you answer because,
14 because your attorney may object, and give him that
15 opportunity.  So try to avoid anticipating.  It
16 becomes a little bit difficult as we march along
17 because there becomes a little bit more familiarity.
18 But just keep that in mind.
19   A   Okay.
20   Q   Even though you're being videotaped you're
21 also, your questions, your answers are going to be
22 transcribed by the reporter.  So it's important for
23 you to provide verbal answers.  Nonverbal answers
24 like nodding of the head or grunting yes or no make

Page 8

1 the record unclear.  So just keep that in mind, if
2 you could.
3    A   Okay.
4    Q   Have you ever -- do you understand those
5 instructions?
6    A   I do.
7    Q   Have you ever been deposed before?
8    A   No.
9    Q   Okay.  Oh, by the way, I'm remiss.  I want to
10 thank you for agreeing to appear here personally, by
11 the way.
12   A   Okay.
13   Q   So you've never been deposed before.  Now,
14 the other thing I want to tell you before I start the
15 questions, there are going to be some questions here
16 that are of a personal nature, diet and such.
17 They're not meant to be disrespectful at all, sir.
18 They're just germane to the case so I want to let you
19 know that in advance.
20   A   Okay.
21   Q   Did you prepare -- one more instruction.
22 There could come a time when your attorney will
23 object on the grounds of privilege.  And that's
24 another reason to wait for the question to be posed.

Page 9

1 Because there's certain questions you'll be bond to
2 answer if you understand them and there's some
3 questions you'll be instructed not to answer.  So
4 that's why it's important to wait.
5        MR. DONOVAN:  Counsel, do you want to say
6 something?
7        MR. SHEEHAN:  Yes.  If I may, Spencer
8 Sheehan for the Plaintiff.  Perhaps this could
9 go off record or if you, Mr. Donovan, could
10 just inform the witness that if he should need
11 to take a break for a restroom he may do so,
12 but not while a question is pending.  If you
13 could just -- I know it's a formality.
14       MR. DONOVAN:  No, I missed it.
15   Q   (By Mr. Donovan) Counsel is right.  If
16 there comes a time when you need a break you let me
17 know.  As long as the question is answered, you
18 know, I'll accommodate you.  It isn't an attrition
19 test.  You'll have that courtesy.  Trust me.
20   A   Okay.
21       MR. SHEEHAN:  Appreciate it.
22   Q   (By Mr. Donovan) Did you do anything to
23 prepare for this deposition today?
24   A   Nothing to prepare, no.

3 (Pages 6 - 9)

Page 10

1    Q   You're going to have to speak up, sir.
2    A   Oh, no.
3    Q   You didn't review any documents?
4    A   Oh, yes, I did review documents. I
5   apologize.
6    Q   What documents did you review?
7    A   I reviewed the documents that were sent in
8   to the courts.
9    Q   Can you identify any of them?
10    A   If you showed me. Or do you mean --
11    Q   Can you just tell me what they are? The ones
12   that you remember looking at to prepare for the
13   deposition.
14    A   To give you the technical name, no.
15    Q   How many were there?
16    A   I don't recall the amount of pages.
17    Q   Not how many pages, how many documents.
18    A   It was one document, but again I'm not sure
19   how many pages off the top of my head.
20    Q   I'm not going to ask you what you and your
21   lawyer spoke about, but did you communicate with your
22   attorney prior to this deposition to prepare for the
23   deposition?
24    A   Yes.

Page 11

1    Q   And how long did you speak to him for?
2    A   The approximate time I am not sure.
3    Q   What day?
4    A   As previously, or most recently I guess, the
5   longest conversation was Friday.
6    Q   And how long was that conversation?
7    A   I was actually at work and I was trying to
8   do other things while talking, I will admit, but
9   less than 30 minutes.
10    Q   Did you speak to him today?
11    A   Yes.
12    Q   Okay. How long was that conversation?
13    A   Maybe 10 minutes.
14    Q   So all told, counting the documents you
15   reviewed and speaking to your attorney, how long in
16   terms of minutes or hours did you take to prepare for
17   this deposition?
18    A   I guess altogether within the last year?
19    Q   Talking about preparing for the deposition,
20   sir.
21    A   I guess, based on what I told you, I guess
22   40 minutes. Well, that was physical -- I mean
23   verbal communication. And also there was some
24   messages but I don't know if that really counts.

Page 12

1    Q   Are you married, sir?
2    A   I am.
3    Q   What's the date of your marriage?
4    A   November 12, 2022.
5    Q   Congratulations.
6    A   Thank you.
7    Q   First marriage?
8    A   Second.
9    Q   Okay. What was the date of your first
10   marriage?
11    A   November 5, 2011.
12    Q   Do you have any children?
13    A   I do.
14    Q   How many?
15    A   I have seven children.
16    Q   Can you tell me their ages?
17    A   Fourteen, 13, 11, 11, 10, eight, and six
18   months.
19    Q   Congratulations again.
20    A   Thank you.
21    Q   Those seven children, do -- well, let me back
22   up. Where do you currently reside?
23    A   My physical address or just the city?
24    Q   Physical address.

Page 13

1    A   3209 Hunters Way, that's Shiloh, Illinois
2   62221.
3    Q   And how long have you lived in Shiloh,
4   Illinois?
5    A   I've been in Shiloh now, I guess, right at a
6   year.
7    Q   And prior to living in Shiloh, Illinois where
8   did you live?
9    A   I lived in East St. Louis proper.
10    Q   Address?
11    A   32 Hilltop, East St. Louis, 62203, I believe
12   it was.
13    Q   How long did you live at the 32 Hilltop
14   address?
15    A   I can't remember if it was two or three
16   years.
17    Q   Prior to living at the 32 Hilltop address
18   where did you reside?
19    A   2 Catherine Court, Apartment 5, Swansea,
20   Illinois 62226.
21    Q   And how long did you live at the 2 Catherine
22   Court address?
23    A   Three years.
24    Q   And prior to living at 2 Catherine Court

4 (Pages 10 - 13)

Page 14

1  where did you reside?
2      A  I can't remember the actual house address,
3  but the street was Winward Way, which is also in
4  Swansea, Illinois.
5      Q  How long did you live on Woodward Way?
6      A  No. Winward, W-i-n-w-a-r-d.
7      Q  W-i-n --
8      A  W-a-r-d. Winward.
9      Q  How long did you live at that address?
10     A  Oh, boy.  Four years.  Approximately.
11     Q  Do any of the children that you mentioned
12  reside with you?
13     A  Yes.
14     Q  How many?
15     A  Three.
16     Q  Can you tell me the age of the ones that
17  reside with you?
18     A  Fourteen, ten, and six months.
19     Q  And the other four live with your first wife?
20     A  I'm sorry?
21     Q  The other four children live with the first
22  wife?
23     A  Yes.
24     Q  And your first wife's name?

Page 15

1      A  Ashley.
2      Q  Does she still have your name?
3      A  No.  Arnold.
4      Q  Arnold?
5      A  Yes.
6      Q  And where do the children live with Ms.
7  Arnold?
8      A  They live here in St. Louis.  Physical
9  address I'm going to have to get my phone.
10     Q  They live in St. Louis?
11     A  Yes.
12     Q  Did you ever reside in Missouri?
13     A  Yes.
14     Q  When?
15     A  Pretty much all the way up until -- all my
16  life all the way up until 2007 or '08.  2008.  And
17  then I moved back over here, I guess, two years
18  before moving back over to Illinois.
19     Q  I'm sorry.  You said you moved back over
20  here, you mean moved back to Missouri?
21     A  Moved back to Missouri.  And then I moved
22  back to Illinois, I guess, about two years or so.
23     Q  When were you living in Missouri?  You said
24  you lived in Missouri until 2008 and then you moved

Page 16

1  back to here, meaning Missouri.
2      A  Yes.
3      Q  When did you do that, when did you move back
4  to Missouri?
5      A  2011 through '13, '14.
6      Q  And what address were you living in at
7  Missouri?
8      A  Again, I don't remember the physical
9  address.  The street was -- I don't know the street.
10  I forget the name of the street.
11     Q  What town or city in Missouri?
12     A  St. Louis.
13     Q  So sometime in 2014 you left Missouri and
14  moved to Illinois?
15     A  Yes.
16     Q  Can I have the extent of your education, sir?
17     A  A Bachelor's degree.
18     Q  From where?
19     A  I'm sorry?
20     Q  From what institution?
21     A  Calvary Bible College.
22     Q  And what was your degree in?
23     A  Biblical studies.
24     Q  What year did you get that degree, sir?

Page 17

1      A  2014.
2      Q  And where is Calvary Bible College?
3      A  It's in Kansas City.
4      Q  Kansas City, Missouri?
5      A  Yes, Missouri.  And, no, I did not root for
6  the Chiefs.
7      Q  What's your date of birth?
8      A  June 23, 1986.
9      Q  June 23, 1986?
10     A  Correct.
11     Q  I'm going to ask you to raise your voice --
12  elevate your voice, I shouldn't say raise, just
13  slightly.
14     A  Okay.
15     Q  Please.  Thank you.  And can I have your
16  height and weight?
17     A  My height is 5'9" and I weigh approximately
18  230 pounds.
19     Q  So when you were studying at Calvary Bible
20  College, were you living in Kansas City, Missouri?
21     A  Initially, yes.
22     Q  And then after that where were you living
23  during your school years?
24     A  Between Illinois and Missouri in the St.

5 (Pages 14 - 17)

Page 18

1  Louis area doing online classes.
2      Q   So there was a time when you physically
3  attended the bible college and other times you were
4  taking them remotely?
5      A   Correct.
6      Q   And you attended there for four years?
7      A   Yes. Well, actually more. It was a four
8  year degree.
9      Q   How many years did you attend there?
10     A   I guess about five.
11     Q   Do you suffer from any health-related issues
12  like diabetes?
13     A   Asthma.
14     Q   Other than asthma?
15     A   No. I'm sorry. Yes, I do. I don't like to
16  claim it, but high cholesterol.
17     Q   Are you taking medication for the high
18  cholesterol?
19     A   I am.
20     Q   Since when?
21     A   I think my doctor put me on it initially in
22  2021 and then -- I'm sorry. No. I take that back.
23  Initially in 2019. And then I was taken off and put
24  back on it.

Page 19

1      Q   Do you take any medication for your asthma?
2      A   Yes.
3      Q   What is that?
4      A   I take an inhaler and a pill.
5      Q   Inhaler and -- I'm sorry?
6      A   And a pill.
7      Q   So other than the asthma and high
8  cholesterol, any other health issues?
9      A   I had a surgery, but that was many years
10  ago.
11     Q   Surgery for what?
12     A   My ear. Actually I have artificial bones in
13  my right ear.
14     Q   So you have -- are you hearing impaired?
15     A   I've not been classified but, yeah, I can
16  hear.
17     Q   Are you hearing me okay?
18     A   I can hear you okay.
19     Q   Thank you. Are you employed?
20     A   Yes.
21     Q   By whom are you employed?
22     A   My primary job is through Beyond Housing.
23     Q   Beyond Housing?
24     A   Correct.

Page 20

1      Q   And where are they located?
2      A   In St. Louis, Missouri.
3      Q   Do they have an address?
4      A   Yes, but I don't know the address. I'm
5  sorry. I don't go to the office very often.
6      Q   What do you do for Beyond Housing?
7      A   So I'm actually housed in a school building,
8  which is why I don't go to the office very often,
9  but I am a liaison. I work between the community
10  and the families of our school connecting them with
11  resources in the community.
12     Q   And what's the name of the school?
13     A   Bel-Nor Elementary.
14     Q   Bel-Nor?
15     A   B-e-l N-o-r.
16     Q   Can you spell that for me, please?
17     A   B-e-l-N-o-r.
18     Q   And Bel-Nor Elementary is in St. Louis?
19     A   Correct.
20     Q   How long have you been working for Beyond
21  Housing?
22     A   Nearly -- almost a year and a half ago.
23     Q   Are you an employee there or do you own the
24  business?

Page 21

1      A   I'm an employee.
2      Q   And before working at -- well, besides Beyond
3  Housing do you have any other jobs?
4      A   Yes.
5      Q   Did you say partner job or part-time job?
6      A   No. I said that's my primary job.
7      Q   Primary job. Excuse me.
8      A   But I do have a part-time job.
9      Q   Currently?
10     A   Yes.
11     Q   And what's that, sir?
12     A   So I also work for Better Family Life as an
13  after-school assistant. I work an after-school
14  program at the school.
15     Q   And where is Better --
16     A   It's on Page here in St. Louis. I'm not
17  sure of the --
18     Q   I'm sorry. The name of it again is Better
19  Fair Housing?
20     A   No. Better Family Life.
21     Q   Better Family Life. Excuse me. And it's on
22  Page Street in St. Louis?
23     A   Yes.
24     Q   How long have you been working at Better

Page 22

1  Family Life?
2      A  I guess about five months now.
3      Q  Prior to working at Beyond Housing were you
4  employed?
5      A  Yes.
6      Q  With whom?
7      A  City Hope St. Louis.
8      Q  And where are they located?
9      A  They're here in St. Louis.
10     Q  St. Louis, Missouri?
11     A  Correct.
12     Q  And how long were you working at City Hope
13  St. Louis?
14     A  I guess 11 months maybe.
15     Q  Was that a full-time job?
16     A  It was.
17     Q  Prior to City Hope St. Louis where did you
18  work?
19     A  Bridges Community Support.
20     Q  How long did you work there?
21     A  I forget.  Just under a year as well.
22     Q  About a year?
23     A  Yeah.
24     Q  Where are they located?

Page 23

1      A  They're here in St. Louis as well.  I also
2  worked off campus for them.
3      Q  Which street, do you remember?
4      A  Their main office -- I don't remember which
5  street the main office is on.
6      Q  City Hope St. Louis, we'll go back there.
7  What type of work did you do for them?
8      A  I was the assistant program manager for
9  emergency housing.
10     Q  What about Bridge Community Support?
11     A  Bridges.
12     Q  Bridges.  I'm sorry.
13     A  I was the manager -- I'm trying to remember
14  the correct title of that position.  I forget the
15  correct actual title for that, but it was in
16  management as well.
17     Q  Prior to working at Bridges Community Support
18  where did you work?
19     A  Behavior Intervention Services.
20     Q  How long did you work there?
21     A  That was definitely less than a year.
22     Q  Where are they located?
23     A  They were also here in St. Louis.
24     Q  What did you do for them?

Page 24

1      A  Program manager.
2      Q  And prior to Behavior Services?
3      A  Missouri Mentor.
4      Q  And what did you do for Missouri Mentor?
5      A  I was a residential supervisor.
6      Q  What is Missouri Mentor?
7      A  Missouri Mentor, Behavior Intervention
8  Services, and Bridges Community Support, all three
9  companies work with individuals with developmental
10  disabilities.
11     Q  And how long did you work with Missouri
12  Mentor?
13     A  Mentor, I think, was about two years.
14     Q  Prior to Missouri Mentor where did you work?
15     A  St. Louis Public Schools.
16     Q  What public school?
17     A  St. Louis Public Schools.  Oh, which school?
18     Q  Yes.
19     A  Hodgen Tech.
20     Q  How long did you work there?
21     A  Just right around three years.
22     Q  Were you a teacher?
23     A  No.  I was actually in the same role as I am
24  currently.  So I was -- what was the title?

Page 25

1  Community support specialist, I think, or something
2  along those lines.  But I pretty much bridged the
3  gap between the community and parents of the
4  school -- or families of the school.
5      Q  Was St. Louis Public Schools your first job
6  out of college?
7      A  No.
8      Q  Okay.
9      A  Also I worked for -- I'm trying to think out
10  of college.  No.  So coming out I was actually at, I
11  was working for the Salvation Army when I finished
12  up, but I also worked for Hopewell Center.
13     Q  Where for the Salvation Army did you work?
14     A  I worked here in St. Louis.  The Harbor
15  Light location.
16     Q  What about Hopewell Center, where are they?
17     A  They moved since I last worked for them.
18  When I worked for them they were on South Grand at
19  the time.
20     Q  In St. Louis, Missouri?
21     A  In St. Louis, Missouri.
22     Q  Have you ever had employment in East St.
23  Louis, Illinois?
24     A  I had one job.  Actually right after

7 (Pages 22 - 25)

Page 26

1  Hopewell. I worked for Call for Help.
2      Q   Call for Help?
3      A   Yes.
4      Q   And where are they located in East St. Louis?
5      A   I can't remember the physical address, but
6  the street is Lebanon.
7      Q   Lebanon?
8      A   Yes.
9      Q   How long did you work for Call for Help?
10     A   I worked for Call for Help for just over a
11  year.
12     Q   Were you working that job as well as another
13  job in St. Louis at the same time?
14     A   No.
15     Q   So that was a full-time position?
16     A   Yes.
17     Q   So other than Call for Help you've had no
18  other employment in East St. Louis, is that correct?
19     A   No. That's the only job in East St. Louis.
20     Q   Have you had any other jobs in Illinois other
21  than the one for Call for Help?
22     A   No.
23     Q   So the St. Louis Public School job, did you
24  leave there voluntarily?

Page 27

1      A   Yes.
2      Q   Was your drivers license ever suspended?
3      A   Yes.
4      Q   When?
5      A   I can't remember if it was 2017 or '18.
6      Q   2017 or '18?
7      A   Yeah. Somewhere in there.
8      Q   What state suspended your license?
9      A   So the license were actually Illinois
10  license, but it was Missouri who reached out to
11  Illinois to have my license suspended.
12     Q   Why was it suspended?
13     A   For an unpaid speeding ticket.
14     Q   Did you ever have a Missouri drivers license?
15     A   Yes.
16     Q   When?
17     A   I guess prior to 2008.
18     Q   So when you moved back to Missouri you kept
19  an Illinois drivers license? After 2008 you said you
20  moved back to Missouri?
21     A   Yes.
22     Q   You never reinstated a Missouri drivers
23  license after 2008?
24     A   After 2008? I apologize. I did. When I

Page 28

1  moved back -- I do apologize. When I moved back in
2  2011. So during the times I lived over here in
3  Missouri I did have a Missouri drivers license.
4      Q   Have you ever been convicted of a crime?
5      A   No.
6      Q   Do you do grocery shopping?
7      A   Yes.
8      Q   And where do you customarily buy your
9  groceries?
10     A   It depends what's closest, what I'm
11  purchasing. Usually it could be Walmart, Schnucks,
12  Dierbergs.
13     Q   Gelbergs?
14     A   Dierbergs, D-i-e-r-b-e-r-g-s. And Schnucks
15  S-c-h-n-u-c-k-s.
16     Q   Do you ever shop at Sam's Club?
17     A   Yes.
18     Q   QuikTrip?
19     A   Yes.
20     Q   Casey's?
21     A   Yes. Actually as far as QuikTrip and
22  Casey's, when you say grocery shopping, those aren't
23  really groceries. They're more like convenient
24  marts like gas stations.

Page 29

1      Q   So you shop there but you don't do your
2  grocery shopping there?
3      A   Yeah, not produce, but I have purchased
4  things from those places.
5      Q   Aldi's?
6      A   I haven't been to Aldi's in awhile, but I
7  have in the past.
8      Q   Do you have a Sam's Club card?
9      A   Not anymore.
10     Q   When did you have one?
11     A   It's been awhile.
12     Q   Does your wife have a Sam's Club card or a
13  similar big box store card?
14     A   Presently, no.
15     Q   And when you shop for your groceries, do you
16  use cash and credit card or is there a certain way
17  you usually shop for groceries in terms of paying?
18     A   Mostly cash. Sometimes credit or debit.
19     Q   Who holds the credit card that you would use
20  for groceries?
21     A   Typically I do.
22     Q   No.
23     A   Who holds -- oh, I'm sorry.
24     Q   That's an improperly vague question. You,

8 (Pages 26 - 29)

Page 30

1  obviously, are holding it. What is the institution
2  that provides the credit on that card?
3      A  Okay. Navy Federal.
4      Q  Are you a veteran?
5      A  No. This just saved me a lot of money the
6  other day. So I am a volunteer firefighter. I'm
7  the chaplain for firefighter services and I saved a
8  lot of money. I forget to tell people this. The
9  insurance company was like, yeah, that just saved
10  you a lot of money.
11     Q  Okay. So you're a chaplain for the
12  firefighting department?
13     A  Yes.
14     Q  Where?
15     A  Villa Hills, which is in Illinois.
16     Q  Villa Hills, Illinois?
17     A  Yes. It's really weird but, yeah.
18     Q  And how long have you been a chaplain for
19  them?
20     A  Just over a year.
21     Q  So you've been a volunteer for the fire
22  department for about a year?
23     A  Yes.
24     Q  Okay. So you mentioned Navy Federal. So for

Page 31

1  a year you've held that card or did you have that
2  card prior to that?
3      A  No. I've had that card since, I guess, just
4  over two years.
5      Q  And prior to having a Navy Federal credit
6  card what other credit cards did you have to use for
7  groceries?
8      A  I have Capital One.
9      Q  Capital One?
10     A  Yes.
11     Q  Any other card?
12     A  No.
13     Q  And you said a debit card?
14     A  Yes.
15     Q  What's the institution that issues the debit
16  card?
17     A  Navy federal.
18     Q  So you have a bank account with Navy Federal?
19     A  Correct.
20     Q  How long have you had that bank account?
21     A  Just over two years.
22     Q  And prior to the debit card with Navy Federal
23  did you have a debit card with any other institution
24  for which you bought groceries?

Page 32

1      A  Bank of America.
2      Q  How long did you hold that card?
3      A  For more than 10 years.
4      Q  Your credit card use with Capital One, how
5  long were you using that for?
6      A  I guess about four years give or take.
7      Q  Any other credit card?
8      A  No.
9      Q  The only credit card you've ever had in your
10  adult life is a Capital One card other than the Navy
11  Federal one?
12     A  Correct. I try not to use too much credit.
13  Hate paying people back. Wish I could have paid
14  cash for my car.
15     Q  How many cars do you have?
16     A  One.
17     Q  What type of car?
18     A  2017 Kia Sorento.
19     Q  Kia, that's a Korean vehicle?
20     A  Yes.
21     Q  Made in Korea?
22     A  No. It's probably made in the U.S. I don't
23  know.
24     Q  But Kia stands for Korean -- do you know what

Page 33

1  it stands for?
2      A  I have no clue what it stands for.
3      Q  This matter concerns your claims about buying
4  Defendant's products, namely the Arnold Palmer Lite
5  product. You're aware of that, right?
6      A  Correct.
7      Q  Do you have any receipts of any of those
8  purchases?
9      A  I don't keep receipts.
10     Q  So the answer is no?
11     A  No.
12     Q  Do you have any containers?
13     A  No.
14     Q  Did you ever purchase the Arnold Palmer Lite,
15  we'll call that for purposes the shorthand version of
16  the product that's at issue in this case.
17         Did you ever purchase the Arnold Palmer
18  Lite in Missouri?
19     A  Yes.
20     Q  When?
21     A  I don't recall.
22     Q  Where?
23     A  Likely it would have been at a QuikTrip.
24     Q  I didn't ask where. I said when.

9 (Pages 30 - 33)

Page 34

1    A   Oh, I thought you said where.
2    Q   Sorry.
3    A   I can't recall.  So if I can explain that I
4    typically --
5    Q   I'm sorry.  I think you're right.  I asked
6    you when, you said I don't recall, and then I said
7    where.  So that's my mistake.  I'm sorry.  And you
8    said likely at a QuikTrip?
9    A   Yes.
10   Q   Do you know whether it was at a QuikTrip?
11   A   Yeah.  Because typically when I buy them I'm
12   at QuikTrip or BP.  Those are the two gas stations I
13   use.
14   Q   And the QuikTrip is located where in
15   Missouri?
16   A   Oh, they're all throughout.
17   Q   In St. Louis and elsewhere?
18   A   Yes.
19   Q   Have you ever purchased the Arnold Palmer
20   Lite in a state other than Illinois or Missouri?
21   A   I don't think so.
22   Q   Do you have a Facebook account?
23   A   I do.
24   Q   Have you ever posted anything on your

Page 35

1    Facebook account about this case?
2    A   No.
3    Q   Have you ever posted anything on your
4    Facebook account about Defendant's products?
5    A   No.
6    Q   Have you ever posted anything on the
7    internet, any social media platform or on the
8    internet at all about this case?
9    A   No.
10   Q   Have you ever posted anything on the internet
11   about defendant's products?
12   A   No.
13   Q   Now, did there come a time that you filed a
14   bankruptcy petition?
15   A   I'm sorry.  What was your question?
16   Q   Did there come a time when you filed a
17   bankruptcy petition?
18   A   Yes.
19   Q   When was that?
20   A   2019.
21   Q   And what prompted that?
22   A   What prompted that?  So I had a vehicle that
23   was insured.  I ran into issues with the insurance
24   company -- I'm sorry.  I jumped over.  Long story.

Page 36

1    I had an accident with a deer two weeks after
2    purchasing the vehicle, or less than two weeks
3    actually, and could not get the insurance company to
4    pay.  I had got insurance company.  The insurance
5    the company could not pay their portion without the
6    insurance company paying their portion.  And I was
7    still pretty young and I didn't want to walk around
8    the rest of my life with that over my head.
9    Q   When was that car accident?
10   A   2017.
11   Q   Were you injured as a result of the accident?
12   A   No.
13   Q   Where was the accident?
14   A   It was in Swansea, Illinois on Route 159.
15   Q   And what car were you driving?
16   A   At that time I had a 2017 Volkswagen Passat.
17       (Deposition Exhibit P-1 marked
18       for identification.)
19   Q   (By Mr. Donovan) Sir, I'm going to show you
20   what's marked P-1 for identification.
21   MR. SHEEHAN:  Thank you.
22   Q   (By Mr. Donovan) Can you tell me what that
23   is?
24   A   I don't see anything.  You said --

Page 37

1    Q   P-1.  Do you know what that is, that
2    document?
3    A   Not exactly.  I guess this is the bankruptcy
4    form.
5    Q   If you go to page 73 of 74 -- actually you
6    can start at 72 of 74.  It's about the second or
7    third page to the end.  The third page to the end.
8    On the bottom left, is that your signature?
9    A   Yes.
10   Q   And the next page, is that your signature?
11   A   Yes.
12   Q   This is your petition for bankruptcy,
13   correct?
14   A   Correct.
15   Q   Go to page 28 of 74, sir.  It refers to some
16   of your creditors there, correct?
17   A   Correct.
18   Q   And Capital Bank, is that the credit card you
19   were referring to?  On line 4.1.
20   A   I think so.  I'm not sure.
21   Q   Department of Ed/Navient, which is 4.2.  Is
22   that a student loan?
23   A   Yes.
24   Q   4.3, CNAC.  What was that debt for?

10 (Pages 34 - 37)

Page 38

1    A   Actually I'm not sure why that was on here.
2   Because that was actually a car that I had, which
3   was irrelevant to all of this, because I still had
4   the car.
5    Q   The 2017 car, you still have?
6    A   No, no, no, no. Not the '17. This was like
7   2010.
8    Q   But the CNAC is for a car loan?
9    A   Yes.
10    Q   And the next page, Nelnet Loan Services, what
11   was that debt for?
12    A   Student loan.
13    Q   And then MS Department of Human Services,
14   Chicago -- well, it says CHI. Jackson, Mississippi?
15    A   Yes. So actually this was for child support
16   that was never supposed to be on here anyway. I
17   don't know how I ended up with Mississippi child
18   support for a kid that was in Missouri.
19    Q   Did any of your children live in Mississippi?
20    A   No.
21    Q   You had mentioned that you had seven
22   children. Are they all from the two wives
23   collectively or is there someone who had your child
24   that you didn't marry?

Page 39

1    A   Collectively they're between the two.
2    Q   So do you know whether or not any of your
3   children ever lived in Mississippi?
4    A   No. Between Missouri and Illinois.
5    Q   Commonwealth Finance, which is below MS
6   Department of Human Services. What's that debt for?
7    A   I am not sure.
8    Q   Well, you swore under penalty of perjury that
9   everything here is accurate. So everything here is
10   accurate, correct?
11    A   I would assume so. I'm not sure what
12   Commonwealth is. I would have to look into it.
13    Q   If you'll go to page 42. That refers to the
14   Missouri Mentor?
15    A   Yes.
16    Q   That you referred to earlier?
17    A   Correct.
18    Q   Okay. Page 63 of 74, line 13. Fill in the
19   state in which you live and you put Missouri,
20   correct?
21    A   Correct.
22    Q   So as of February 25, 2019 you were residing
23   in Missouri?
24    A   I guess so.

Page 40

1    Q   I'm sorry?
2    A   I believe -- yeah, it had to be.
3    Q   Now, Mr. Sheehan is your attorney. I'm not
4   going to ask you questions about what you
5   communicated with him about this case, that's
6   privileged. But I would like to know how did you
7   find out about Mr. Sheehan as an attorney, how did
8   that come about?
9        MR. SHEEHAN: Are we done with this?
10        MR. DONOVAN: For now. I don't want to
11   instruct the witness --
12        MR. SHEEHAN: Yeah. Thank you.
13    A   Finding out about Mr. Sheehan as an attorney
14   is in my initial conversation with him.
15    Q   (By Mr. Donovan) Which occurred when?
16    A   February of 2022.
17    Q   And how did you find out about him?
18    A   And that's an approximate time frame. So
19   actually I saw an ad on Facebook.
20    Q   What did the ad say?
21    A   I can't recall verbatim, but I remember it
22   being something dealing with Arizona, Arizona Tea,
23   and I guess the lite, the Arnold Palmer Lite
24   product.

Page 41

1    Q   And was this an advertisement that came out
2   to your personal Facebook page?
3    A   Yes.
4    Q   Do you still have that advertisement?
5    A   I do not.
6    Q   Have you ever been a plaintiff in a putative
7   class action before this case?
8    A   Can you explain that?
9    Q   Have you ever been in a lawsuit before as a
10   plaintiff?
11    A   No. So actually -- well, there was a class
12   action lawsuit against a previous employer some
13   years ago where we didn't receive time and I just
14   received a check. I didn't even know what was going
15   on until I questioned the check.
16    Q   When did that happen?
17    A   The time frame from working there?
18    Q   That was an imprecise question. What was the
19   name of the employer?
20    A   Oh, Barnes-Jewish Hospital.
21    Q   I'm sorry?
22    A   Barnes-Jewish Hospital.
23    Q   Born?
24    A   Barnes, B-a-r-n-e-s.

11 (Pages 38 - 41)

Page 42

1    Q   Jewish Hospital?
2    A   Correct.
3    Q   Did you work for them?
4    A   I did.
5    Q   When?
6    A   Oh, boy.  2008 through 2009.
7    Q   And where are they?
8    A   St. Louis.
9    Q   So you received money as a result of a class
10   action that involved Barnes-Jewish Hospital?
11   A   Correct.
12   Q   Other than that have you ever been involved
13   in any class actions?
14   A   No.
15   Q   Other than this putative one?
16   A   No.
17   Q   Can you explain to me, how, if you know, how
18   you received an advertisement from Mr. Sheehan's firm
19   on your Facebook?  Do you know how that came about?
20   A   Actually I'm not sure.
21   Q   So after you received the advertisement what
22   did you do?
23   A   I responded to it.
24   Q   How did you respond to it?

Page 43

1    A   By answering some questions.
2    Q   And how long did it take you to answer those
3    questions?
4    A   Maybe just under a minute.
5    Q   At that point when you were answering
6    questions were you looking for representation to sue
7    Arizona at that point?
8    A   Yes.
9    Q   Why?
10   A   Because their label is very misleading.
11   Q   So is it fair to say before you received a
12   Facebook advertisement you had already drawn that
13   conclusion that Arizona's label was misleading?
14   A   Oh, absolutely.
15   Q   How far along before in terms of time did you
16   draw that conclusion?
17   A   I'm not sure of the time frame.
18   Q   Within a year, less than a year, you held
19   that belief?
20   A   Definitely less than a year.
21   Q   When you said you responded and it took you
22   about a minute to provide information, at that point
23   in time -- strike that.  Withdrawn.
24       Did you -- when you provided that

Page 44

1    information did you provide it in writing?
2    A   Yes.
3    Q   And you submitted it to whom?
4    A   I would assume it went to Mr. Sheehan's
5    office.
6    Q   And after you sent it to Mr. Sheehan's office
7    did you have -- strike that.  Withdrawn.
8        At the point in which you were filling out
9    this information in response to the Facebook ad, had
10   you had any oral communication with Mr. Sheehan?
11   A   No.
12   Q   After you sent the submission to Mr. Sheehan,
13   the response, did you have an oral conversation with
14   Mr. Sheehan prior to retaining him?
15   A   Yes.
16   Q   How soon after the written response do you
17   recall talking to him?
18   A   It was just a matter of days.
19   Q   Mr. Sheehan called you?
20   A   Yes.
21   Q   And how long was that --
22   A   No.  I'm sorry.  His office assistant called
23   me to set up an appointment to speak to him.
24   Q   Okay.  So you set up an appointment to speak

Page 45

1    with him through the office?
2    A   Yes.
3    Q   And soon after that did you speak to
4    Mr. Sheehan?
5    A   I don't recall.  It wasn't very long after.
6    Q   More than a month or less than a month?
7    A   Oh, definitely less than a month.
8    Q   How long was that conversation with
9    Mr. Sheehan?
10   A   Maybe an hour.
11          (Deposition Exhibit P-2 marked
12          for identification.)
13   MR. SHEEHAN:  Can I interrupt briefly?  Is
14   it possible that these documents will be
15   unloaded somewhere to a website as exhibits?
16   MR. DONOVAN:  We'll deal with that after.
17   MR. SHEEHAN:  Okay.  Thank you.
18   Q   (By Mr. Donovan) I'm going to show you
19   what's been marked P-2, sir.
20   MR. SHEEHAN:  Thank you.
21   Q   (By Mr. Donovan) Have you ever seen that
22   document before, sir?
23   A   Yes.
24   Q   When was the first time you remember seeing

12 (Pages 42 - 45)

Page 46

1  it?
2    A  I guess in December of '21.
3    Q  Okay.  I know some people coloquically refer
4  to guess, but if you don't know the answer to
5  something -- do you remember at the beginning we
6  talked about --
7    A  Yes.
8    Q  That was more in the context of
9  understanding.  But I'm not here to find out what
10  your guesswork is.  I'm here to find out what you
11  know.
12    A  Okay.
13    Q  So do you know when was the first time that
14  you ever saw P-2?
15    A  December of 2021.
16    Q  And is that your signature at the bottom of
17  the first page?
18    A  That is my signature.
19    Q  And it refers to Mr. Sheehan's firm at the
20  top there.  Do you see that?
21    A  Yes.
22    Q  And it refers to leads@spencersheehan.com.
23  Do you see that?
24    A  Yes.

Page 47

1    Q  Do you know what -- did you ever access that
2  website?
3    A  No.
4    Q  So how was it that you obtained a copy of
5  this P-2?
6    A  Actually.  I'm sorry.  Yes, I did.  I did.
7  I'm sorry.
8    Q  So how was it that you obtained a copy of
9  P-2?
10    A  Via email.
11    Q  From an email from whom?
12    A  Spencer Sheehan.
13    Q  When did you receive that email?
14    A  In December of '21.
15    Q  Sometime prior to December 19, 2021?
16    A  I'm not exactly sure.
17    Q  Well, your signature says it's dated
18  December 19, 2021.
19    A  Oh, then -- well, if I signed it this date
20  then, yeah.
21    Q  Do you know how many days prior that you
22  received this document before you signed it?
23    A  I'm pretty good about responding to emails
24  immediately so I would have to say I definitely

Page 48

1  probably signed this the day of.
2    Q  How long -- did you review this document
3  before you signed it?
4    A  How long did I review it?
5    Q  I first asked did you review it before you
6  signed it?
7    A  Yes.  Absolutely.
8    Q  How long did you take to review it?
9    A  I can't recall how long I looked at it.
10    Q  So if you look at the second page, sir, first
11  paragraph it says:  This form may be prefilled based
12  on information you provided.  Please fill in or
13  correct fields where you receive a prompt to do so.
14  Do you see that?
15    A  Yes.
16    Q  So did you provide information to the Sheehan
17  firm prior to receiving P-2?
18    A  I did.
19    Q  And what information -- when did you do that?
20    A  December of '21, if I remember correctly.
21    Q  And what information did you provide that's
22  referred to as prefilled information, if you know?
23  Starting on page 2.
24    A  My name, date.  I'm sorry -- not date, name,

Page 49

1  address.  And also I guess the locations where I
2  purchased, made purchases, and this Mobile gas
3  station is one of the places that we discussed.
4    Q  So you put your name, you provided your name
5  and address?
6    A  Yes.
7    Q  Did you provide them the email address?
8    A  I did.
9    Q  Your phone number?
10    A  I did.
11    Q  Are you responsible for the who?
12    A  Yes.
13    Q  So you put in Arizona Beverage Co. and any
14  other affiliated or responsible entity?
15    A  No.  I'm sorry.  I didn't put that in.
16    Q  Your attorney did that?
17    A  Yes.
18    Q  What about the how, did you put that in or
19  did your attorney put that in?
20    A  Those are my words.
21    Q  And what about the what, did you put that in?
22    A  I did not.  Those are the attorney.
23    Q  Store, website, other, did you put that
24  information in there or provide that information?

13 (Pages 46 - 49)

Page 50

1   A  I provided that information.
2   Q  And location?
3   A  I provided that information as well.
4   Q  And when?
5   A  I also provided that information.
6   Q  On page 4 are those your initials?
7   A  They are.
8   Q  Page 5, are those your initials?
9   A  They are.
10  Q  And on page 7, is that your signature?
11  A  Yes, it is.
12  Q  I see that Mr. Sheehan's signature is dated
13  February 5.  So is it fair to say that you didn't
14  know you had Mr. Sheehan as your lawyer until
15  February 5?
16  A  Actually the dates on here are incorrect.
17  It was February of 2022, as I state previously, that
18  I spoke with Mr. Sheehan.
19  Q  I'm sorry.  Are you telling me your date of
20  February -- of December 19, 2021 is incorrect?
21  A  Yeah.  That's incorrect.
22  Q  So the first time you spoke to Mr. Sheehan
23  was February 5, 2022?
24  A  I can't say it was February 5, but I know it

Page 51

1   was definitely February.
2   Q  So prior to February 2022 you never had any
3   communication with Mr. Sheehan?
4   A  I'm sorry.  Prior to?
5   Q  February of 2022, did you have any
6   communication with Mr. Sheehan?
7   A  That would be correct.
8   Q  So you received the Facebook advertisement in
9   February of 2022?
10     MR. SHEEHAN:  Objection.  Asked and
11     answered.  You may proceed.
12  A  I'm sorry.  Can you repeat that question?
13  Q  (By Mr. Donovan) You referred earlier to a
14  Facebook advertisement.
15  A  Yes.
16  Q  And you said you received it and you
17  responded to it.
18  A  Correct.
19  Q  Are you saying that you responded to that
20  Facebook advertisement in February of 2022?
21  A  No.  It was before February.
22  Q  When?
23  A  Actually let me say this:  It had to be
24  between January and February of 2022.

Page 52

1   Q  Why do you say that?
2   A  I remember it being cold is pretty much what
3   I remember.  And I know in February having the
4   conversation with Mr. Sheehan because I was inside
5   the new house and I wasn't in the new house in
6   December of 2021.
7   Q  The new house where you reside now?
8   A  Where I reside now.
9   Q  So why did you date the signature
10  December 19, 2021?  Did you date that signature?  Or
11  withdraw the question.
12     Did you date the document December 19,
13  2021?
14  A  I did not date this document.
15  Q  Why did you sign with that date?
16  A  Did I sign this with this date?
17  Q  Look at the first page, sir.
18  A  I'm looking at it.
19  Q  And the last page was also dated December 19,
20  2021.
21  A  Yeah.  I don't know what happened there.
22  Q  Is it possible, sir -- I'm sorry.  So you
23  don't have an answer, you don't know why it's dated
24  December 19, 2021, is that correct?

Page 53

1   A  Correct.
2   Q  Is it possible that Mr. Sheehan sent you this
3   document around December 19, 2021, you signed it, you
4   sent it to him, and you didn't get his signature
5   until February 5?
6   A  I'm looking through it now to see which
7   document this is.  If I may take a look at my email
8   that will help me.
9   Q  You still have the email that you sent to
10  him?
11  A  Maybe.
12  Q  You can certainly look at something to
13  refresh your memory, but I'll have to take a look at
14  it at some point.
15  A  Okay.
16     MR. DONOVAN:  I'll have your attorney look
17     at it first, but since it's refreshing your
18     memory I'll have to put it on the record.
19     MR. SHEEHAN:  Also, put on the record, I
20     will provide an audit log so it will show what
21     date and IP address, you know, it was signed.
22     Usually we provide that.  Sometimes it don't
23     say depending on the way it's saved.  I thought
24     I might have provided that.  It looks like it's

14 (Pages 50 - 53)

Page 54

1  a page with -- just make sure to ask me for
2  that so I don't forget. And any emails about
3  this I will be glad to provide that.
4      MR. DONOVAN: Thank you.
5      MR. SHEEHAN: Sure.
6  A  So I thought I had it.
7      Q  (By Mr. Donovan) So you don't have that
8  email?
9      A  No. I can't find it where I thought I
10  could.
11      Q  I asked you about your drivers license being
12  suspended. How long was it suspended for?
13      A  Not very long. Maybe a month. Just once I
14  found out I took care of it.
15      Q  Was there ever a point in time you had a
16  license in Missouri and a drivers license in Illinois
17  at the same time?
18      A  No.
19          (Deposition Exhibit P-3 marked
20          for identification.)
21      Q  (By Mr. Donovan) Let me show you what's
22  marked as P-3. Have you ever seen that document
23  before?
24      A  Yes.

Page 55

1      Q  Do you know what it is?
2      A  Yes.
3      Q  What is it?
4      A  I'm not sure of the official name, but I do
5  know that it's court documents that has to be, you
6  know, petitioned with the court.
7      Q  Is this one of the documents you reviewed to
8  prepare for this deposition?
9      A  Yes.
10      Q  Under request number 1 it asks you to admit
11  or deny you purchased the product in a state other
12  than Illinois. And you write: Plaintiff admits
13  purchasing the product in a state other than
14  Illinois, namely Missouri. Do you see that?
15      A  Yes.
16      Q  And I asked you, I think I asked you
17  questions about those purchases and you weren't
18  sure -- Missouri purchases. And you were unsure as
19  to when.
20          Based upon what we've seen in terms of
21  some of these documents, can you tell me if that
22  refreshes your memory as to when you were making the
23  Missouri purchases?
24      A  No. Because even while living in Illinois I

Page 56

1  come to Missouri every day because I work -- the
2  majority of my jobs are in Missouri outside of the
3  Call for Help job.
4      Q  Would you say the majority of your purchases
5  of the Arnold Palmer Lite were in Missouri?
6      A  No. Because I sometimes stop for things on
7  my way home in Illinois.
8      Q  Was it even, more in Illinois, less than
9  Missouri, or was it roughly even?
10      A  I'll have to say more so in Illinois.
11      Q  If you were going to approximate how much
12  money on Arnold Palmer Lite that you spent in
13  Missouri, we'll say since 2018, so the past five
14  years on the Arnold Palmer Lite, how much do you
15  think you spent on the Arnold Palmer Lite in Missouri
16  for purchases?
17      A  I would have to say I'm not sure.
18      Q  Can you give me an amount in excess of, in
19  excess of $500, in excess of $100? This is just for
20  the Lite now.
21      A  That's really hard to say.
22      Q  Okay. You don't know?
23      A  Yeah. I'm not sure.
24      Q  Do you know how much you spent in Illinois

Page 57

1  during that same time period?
2      A  Same thing. I'm just not sure.
3      Q  So it's just that your sense is that you
4  spent more money on the Arizona Lite in Illinois than
5  in Missouri?
6      A  Yeah. Because I know that I frequent stores
7  in Illinois more when I stop, you know. Because
8  typically it's a thing that I do. I go in, get gas,
9  and that's my drink of -- well, was my drink of
10  choice, I should say.
11      Q  If you'll go to number 17, please. The
12  request asks you: Admit or deny that you purchased
13  the product more than 50 times between February 6,
14  2019 and February 6, 2022. And you admit that. Do
15  you see that?
16      A  Yes.
17      Q  And would those more than 50 times include
18  purchases in Illinois and in Missouri combined?
19      A  Probably more so in Illinois than Missouri.
20      Q  No. My question was: Does it include the
21  purchases in Missouri as well as Illinois when you
22  say more than 50 times?
23      A  Yes.
24      MR. DONOVAN: If I can take that back. The

15 (Pages 54 - 57)

Page 58

1    copies are for you, Spencer.
2        MR. SHEEHAN: Thank you.
3        MR. DONOVAN: I got it. Don't worry about
4    it.
5        MR. SHEEHAN: You sure?
6        MR. DONOVAN: Yes. Thank you.
7            (Deposition Exhibit P-4 marked
8            for identification.)
9    Q    (By Mr. Donovan) I'm going to show you P-4,
10   sir.
11       MR. SHEEHAN: Thank you.
12   Q    (By Mr. Donovan) Go to the last page,
13   please, and tell me if that's your signature? Or
14   second to the last page.
15   A    Yes.
16   Q    Okay. And these are, these are answers to
17   interrogatories, right?
18   A    I'm sorry?
19   Q    These are answers to interrogatories,
20   correct?
21   A    Yes.
22   Q    And did you review these documents before
23   this deposition, is that -- I'm sorry. Withdraw.
24       Did you review P-4, the answers to

Page 59

1    interrogatories, in preparation for the deposition?
2    A    I don't recall looking at this.
3    Q    If you'll look at the second to the last
4    page, these are sworn under penalty of perjury. You
5    see that, right?
6    A    Yes.
7    Q    Okay. So everything here you signed to is
8    true and correct, right?
9    A    Correct.
10   Q    If you look at paragraph number 2 it refers
11   to you purchasing -- the response. Interrogatory
12   number 2. Purchasing a large sized version of the
13   product weekly at a BP station located at 2 Rauckman
14   Drive, Caseyville, Illinois. Do you see that?
15   A    I'm trying to find that.
16   Q    It's interrogatory number 1 and it's under
17   response.
18   A    That's not what it shows.
19   Q    I'm sorry. Located at 2 Rauckman Drive. Do
20   you see that response under number 2?
21   A    Oh, this goes over to the second page?
22   Q    Yes.
23   A    Yes.
24   Q    And it says you purchased them at a price

Page 60

1    between $1.00 and $2.50. Do you see that?
2    A    Yes.
3    Q    That's true and accurate, that statement?
4    A    Yes.
5    Q    When you say large version of the product,
6    what do you mean?
7    A    It's a large can. I'm not sure of the
8    ounces.
9    Q    It was a can?
10   A    Large can, yes.
11   Q    Not a bottle, a can?
12   A    Correct.
13   Q    Can you approximate the ounces?
14   A    That's what I was trying to remember. Is it
15   32 maybe? No. I can't recall.
16   Q    You don't remember?
17   A    Not off the top of my head, no.
18   Q    And the price was between $1.00 and $2.50 for
19   this can?
20   A    Well, technically, yes. It's just over a
21   dollar.
22   Q    Did you ever purchase the product, we're
23   talking about the Arnold Palmer Lite now, in a
24   container other than in a can?

Page 61

1    A    I know it comes in bottle form, even large,
2    I want to say like a gallon size. I have purchased
3    those, but the can is the one that I mostly would
4    get on the go.
5    Q    And the can is -- sometimes you see the price
6    it says 99 cents?
7    A    Yes.
8    Q    And you say you have some familiarity with it
9    in a bottle and a gallon bottle, sometimes you buy
10   that?
11   A    Not quite as often.
12   Q    But sometimes?
13   A    Yeah. Yeah.
14   Q    And where do you buy the gallon bottle?
15   A    That would be from a grocery store.
16   Q    Like the ones you mentioned?
17   A    Correct.
18   Q    Other than the can and the gallon --
19   A    We are speaking of previous to this, right,
20   not present tense?
21   Q    We're absolutely talking about the past
22   tense.
23   A    Okay.
24   Q    Because you stopped buying the product, the

16 (Pages 58 - 61)

Page 62

1  Lite product, correct?
2    A  That's correct.
3    Q  But with respect to the can and the gallon
4  bottles, are there any other containers that you
5  bought of the Lite product?
6    A  I'm sorry.  What was the question again?
7    Q  Other than the cans and the gallons, are
8  there any other containers that you bought of the
9  Lite product?
10    A  Yes.  Well, sometimes in the smaller bottle.
11    Q  Can you tell me what size the smaller bottle
12  is?
13    A  I am not sure.
14    Q  Was the bottle plastic or glass?
15    A  Plastic.
16    Q  And how many times did you buy the smaller
17  bottle that was in plastic?
18    A  I'm not sure.
19    Q  You do not know?
20    A  No.
21    Q  Can you give me a reasonable approximation
22  how many times you bought the product that was in a
23  small plastic bottle?
24    A  Ballpark figure 10.

Page 63

1    Q  That's an estimate?
2    A  Yes.
3    Q  Is that a guess or an estimate?
4    A  That's a guess.
5    Q  It's a guess?
6    A  Yes.
7    Q  So it's fair to say you do not know how many
8  smaller plastic bottles of the product that you
9  purchased other than the gallon?
10    A  That is correct.
11    Q  And do you know where you made the purchase
12  of the smaller plastic bottles?
13    A  At the same convenience stores whenever they
14  didn't have cans in stock or no cold cans or
15  whatever.
16    Q  So your preference was for cans?
17    A  Correct.
18    Q  Why?
19    A  They were larger.
20    Q  Better value?
21    A  Yes.
22    Q  When you say the same convenience stores, can
23  you tell me where?
24    A  The BP on Rauckman, QuikTrips.

Page 64

1    Q  QuikTrips?
2    A  Yes.  I guess I shouldn't say the BP on
3  Rauckman.  That's not the only one I use.
4    Q  But do you know whether you bought them
5  there?  You don't know how many you bought, but you
6  know you bought the bottles there?
7    A  Oh, yeah.  Typically when I stop for gas I
8  grab, I would grab an Arizona tea.
9    Q  I'm going to show you --
10    A  Actually do you mind if I use the restroom?
11    Q  Oh, sure.  We'll take a break.
12    A  Also it is cold in this room.
13      MR. SHEEHAN:  It's cold?  Yeah.  Thank you.
14      THE VIDEOGRAPHER:  Off the record at 11:39.
15      (Recess)
16      THE VIDEOGRAPHER:  We're back on the record.
17  This is media unit number two.  The time is
18  11:49.
19    Q  (By Mr. Donovan) Going back to
20  interrogatory number 2 again, your answer.  You got
21  to go back to the first page.  I just want to make
22  sure you understand.  When you say large sized
23  version of the product you were referring to just
24  the 23 ounce can?

Page 65

1    A  Is it 23 ounces?
2    Q  Yes.
3    A  Okay.
4    Q  I'm sorry.  You were just referring to the
5  can, whatever size it was?
6    A  Yes.  No.  Well, I'm sorry.
7    Q  Let me rephrase that question.  I'll withdraw
8  the question.
9      When you were referring to the large sized
10  version of the product, you were referring to the
11  can and the gallon product?
12    A  Correct.
13    Q  Any other product?
14    A  As far as purchases?
15    Q  No.  I'm referring to -- sorry to interrupt.
16  I'm referring to the answer to interrogatory.
17    A  Okay.
18    Q  When you say you purchased, in response to
19  the interrogatory, when you were referring to a large
20  sized version of the product, you were referring to
21  the can and the gallon only?
22    A  Yes.  Or actually, no.  I'm sorry.  That is
23  incorrect.  That's for cans only.
24    Q  Okay.

17 (Pages 62 - 65)

Page 66

1    A   As far as a weekly basis.
2    Q   Okay. The question is: Identify each
3   purchase of the product. Do you see that question?
4   And now, when you say large sized version you were
5   referring only to the can?
6    A   Yes.
7    Q   I'm going to direct your attention back to
8   P-2 at page 2. That's your agreement with
9   Mr. Sheehan that we referred to previously. Do you
10   see that?
11    A   Yes.
12    Q   And it refers to the store as the Mobile gas
13   station in St. Louis, Missouri. Do you see that?
14    A   Yes.
15    Q   And is that the location or a location where
16   you would purchase the 23 ounce cans?
17    A   That is a location.
18    Q   Is that in proximity to where you currently
19   work or worked?
20    A   No. It's in proximity to my church.
21    Q   So that's a station that you would frequent
22   when you purchased the products?
23    A   Yes.
24    Q   On a weekly basis?

Page 67

1    A   Yes.
2        (Deposition Exhibit P-5 marked
3        for identification.)
4    Q   (By Mr. Donovan) I'm going to show you
5   what's been marked P-5, sir. And I'm going to point
6   it so the videographer can see that.
7        THE VIDEOGRAPHER: One second. All right.
8   I have it.
9    Q   (By Mr. Donovan) Sir, that is a 23 ounce
10   can of the Lite product, correct?
11    A   That is correct.
12    Q   And when you were referring to the 23 ounce
13   can that you customarily purchased on a weekly basis,
14   is that what the product looked like?
15    A   Yes. I believe this is what it looked like.
16    Q   And you would buy that product and often the
17   product would have a price on it of 99 cents?
18    A   Yes. I do see here one third less calories
19   and I can't confirm or deny that it would always say
20   that.
21    Q   Understood. But in terms of just identifying
22   the container size and the can of the product, that's
23   the quantity and the can that you would purchase?
24    A   That is correct.

Page 68

1    Q   And that's the product you were referencing
2   in response to interrogatory number 2?
3    A   That is correct.
4    Q   Have you ever heard of CK Management, Inc?
5    A   CK Management, Inc? I don't recall.
6    Q   Have you ever heard of Pacific East Partners,
7   Inc?
8    A   That sounds familiar.
9    Q   Have you ever heard of Forbes
10   Pharmaceuticals, LLC?
11    A   Yes.
12    Q   In what way as relation to this case?
13    A   I'm not sure what the relation to the case
14   is.
15    Q   Have you ever read any article from the
16   Nutrition bulletin?
17    A   Yes.
18    Q   What did it say?
19    A   Off the top of my head I am not sure.
20    Q   Do you remember what the date of the document
21   was?
22    A   I don't.
23    Q   Do you know whether any claims -- well,
24   withdrawn.

Page 69

1        Do you know whether this case is in state
2   or federal court?
3    A   It's in federal court.
4    Q   Do you know whether any claims in the case
5   have been dismissed?
6    A   I do not.
7    Q   Did you ever read the Court's decision in
8   this case dismissing claims?
9    A   I have not.
10        (Deposition Exhibit P-6 marked
11        for identification.)
12    Q   (By Mr. Donovan) I'm going to show you P-6,
13   sir. Have you ever seen that document before?
14        MR. SHEEHAN: Thank you.
15    A   Yes. I believe so.
16    Q   (By Mr. Donovan) When was the first time
17   you saw it?
18    A   I don't recall.
19    Q   Do you know what it is?
20    A   It's court documents.
21    Q   Do you know whether or not it's a decision in
22   this case dismissing claims?
23    A   No, I don't.
24        MR. DONOVAN: Thank you very much.

18 (Pages 66 - 69)

Page 70

1    Q    (By Mr. Donovan) I'm going to address, I'm
2    going to take that away from you so you're not --
3    please turn off your phone. Let me take the other
4    documents away. Thank you, sir.
5        Let me direct your attention to the Arnold
6    Palmer beverage in general and tell me if you could
7    read the bottom portion of what's been marked P-5.
8    If not, I'll try to get you a clearer copy.
9    A    The name Arnold Palmer has legendary -- I'm
10   not sure --
11   Q    Are you having difficulty reading that?
12   A    I am.
13   Q    Let me ask the question in a different way.
14   Are you aware of the term an Arnold Palmer beverage?
15   A    Yes.
16   Q    And what does that mean?
17   A    Half tea, half lemonade.
18   Q    And you know who Arnold Palmer is, right? Or
19   was?
20   A    Was he a race car driver or golfer or
21   something?
22   Q    It shows photos of him on that P-5. He's a
23   famous golfer.
24   A    Golfer, yes.

Page 71

1    Q    And are you aware that it's attributed to
2    him, the Arnold Palmer half iced tea and half
3    lemonade is attributed to him as "inventor" of that
4    beverage?
5    A    I wasn't sure.
6    Q    But the Arnold Palmer itself you equate with
7    a beverage that has iced tea and lemonade, correct?
8    A    Yes.
9    Q    Whether or not it's by Arizona it's in and of
10   itself --
11   A    Correct.
12   Q    Let me finish. In and of itself it's its own
13   type of beverage?
14   A    That is correct.
15   Q    And do you know whether you've ever consumed
16   an Arnold Palmer-type beverage other than from
17   Arizona?
18   A    Yes.
19   Q    Made by whom?
20   A    Not by an actual company distributor but
21   when I frequent restaurants.
22   Q    So you ask the restaurant to make you one?
23   A    Yes.
24   Q    And you can make one yourself, you can make

Page 72

1    an Arnold Palmer yourself if you want, right?
2    A    If I wanted to, yeah.
3    Q    Have you ever done that?
4    A    No.
5    Q    We'll go back to P-5 for a second. When you
6    purchased that product what was the price usually?
7    A    99 cents labeled on the can, but depending
8    on where I was located the taxes could be higher.
9    Q    Let me show you -- look at the statement of
10   ingredients on P-5 and tell me if that product
11   contains any sugar.
12   A    Yes.
13   Q    Are you looking at the Nutrition Facts panel?
14   A    Yes.
15   Q    How about under the statement of ingredients?
16   A    No. It doesn't say anything about sugar.
17   Q    Sweetener, correct me if I'm wrong, is high
18   fructose corn syrup?
19   A    Yes.
20   Q    Do you know whether or not the products that
21   you purchased from Arizona contain sugar as opposed
22   to high fructose corn syrup?
23   A    I'm not really so sure.
24   Q    So you don't know, correct?

Page 73

1    A    No.
2        MR. DONOVAN: Let's go off the record for
3    just a second.
4        THE VIDEOGRAPHER: Off the record at 12:06.
5        (Lunch Recess)
6        THE VIDEOGRAPHER: We're back on the record
7    This is media unit number three. The time is
8    12:58.
9    Q    (By Mr. Donovan) Good afternoon,
10   Mr. Crawford. You're still under oath, you
11   understand that, right?
12   A    Yes.
13   Q    Did you purchase the Arnold Palmer Lite
14   product in 2020?
15   A    Yes.
16   Q    2019?
17   A    Yes.
18   Q    2018?
19   A    Yes.
20   Q    2017?
21   A    Yes.
22   Q    Have you ever purchased the Arnold Palmer
23   Lite product for someone else to consume?
24   A    No.

19 (Pages 70 - 73)

Page 74

1  Q  Were you ever with anybody when you purchased
2  the Arnold Palmer product?
3  A  I don't recall.
4  Q  Do you know if anybody ever witnessed you
5  purchase the Arnold Palmer product that you know by
6  name?
7  A  No.  I mean, I don't know the store clerk by
8  name.
9  Q  Other than the store clerk?
10  A  No.
11  Q  Now, you mentioned earlier before we broke
12  for lunch that you thought the Arnold Palmer label
13  was false.  Do you remember that testimony?
14  A  Yes.  Well, misleading, yeah.
15  Q  Misleading.  What did you find misleading
16  about the product?
17  A  That it says lite which gives false hope
18  that it has -- that it's a healthier product.
19  Q  Any other reason why the label is misleading?
20  A  No.  Just pretty much being that it's lite.
21  Q  And when did you first notice the lite label?
22  A  So actually I've always noticed it.
23  Q  So from the very first time?
24  A  Yes.  No.  Correction.  Probably the second

Page 75

1  time because I noticed the taste was different but I
2  didn't mind the taste.
3  Q  Taste was different from what?
4  A  The Arnold Palmers that are sweet tea and
5  regular lemonade.
6  Q  So you noticed it was lite -- different
7  rather -- withdrawn.
8     So you noticed that the Arnold Palmer Lite
9  tasted differently from the Arnold Palmer sweet tea
10  and Arnold Palmer regular tea -- I'm sorry?
11  A  Regular lemonade.
12  Q  Regular lemonade?
13  A  Yes.
14  Q  That you had consumed?
15  A  Correct.
16  Q  When do you recall first noticing it tasted
17  different?
18  A  Probably the first time.
19  Q  When?
20  A  I can't tell you how long I been drinking
21  them.
22  Q  More than 10 years ago?
23  A  I would say that.
24  Q  Correct me if I'm wrong --

Page 76

1  A  Actually, no.  Then I stopped drinking them
2  for a while and picked back up because I thought it
3  was a healthier alternative.
4  Q  Why did you stop drinking them?
5  A  Honestly I started consuming more soda.
6  Q  When was it that you stopped drinking it
7  before you resumed?
8  A  I don't recall.
9  Q  So let's start from the first time you
10  purchased the Arnold Palmer Lite.  Was it in a
11  23-ounce can?
12  A  Yes.
13  Q  And why did you purchase the product?
14  A  Because I enjoy Arnold Palmers.
15  Q  Any other reason?
16  A  When I first started drinking it?
17  Q  Yes.
18  A  That was pretty much it.  But then when I
19  resumed it was because I knew that it was lite
20  according to the label so that's what made me go to
21  drinking them thinking I was picking a healthier
22  drink.
23  Q  Any other reason why you resumed?
24  A  No.  Just at that time I was no longer

Page 77

1  drinking soda.  I was, you know, tea, lemonade,
2  water.
3  Q  So you're looking at the product, when you
4  resumed purchasing the product you knew it was
5  labeled lite and you saw it as a healthier
6  alternative to soda, is that correct?
7  A  That is correct.
8  Q  Any other reason why you resumed?
9  A  Well, also because even while drinking tea
10  and lemonade I was trying to, you know, drinking
11  healthier options on it.  So tea without -- so
12  rather than getting sweet tea I would opt to get the
13  unsweet tea and maybe add lemon to it -- or not
14  maybe but definitely add lemon to it.  So the Arnold
15  Palmer Lite, you know, gave me the idea that it was,
16  you know, a healthier alternative.
17  Q  Healthier in what way?
18  A  That it wouldn't have as many calories.
19  Q  Healthier in any other way other than
20  calories?
21  A  No.  I wasn't looking for any kind of
22  miracle medicine from it.
23  Q  Now, you mentioned earlier in the deposition
24  when I showed you P-5 you said that the Arnold Palmer

20 (Pages 74 - 77)

Page 78

1 Lite product that you purchased didn't say one third
2 less calories. Is that what you're saying?
3    A  I said I can't recall all of the cans having
4 that label.
5    Q  Did some of the cans have that label?
6    A  If I remember correctly I think so.
7    Q  And what did the one third less calories mean
8 to you?
9    A  That it was a healthier drink. That it
10 would not have as much sugar, you know. That it
11 would just be all around healthier.
12    Q  As much sugar as what?
13    A  As regular tea or soda.
14    Q  Did you purchase -- withdrawn.
15       Do you remember seeing a label like that's
16 on P-5 saying one third less calories, see back. Do
17 you see that?
18    A  Yes. I see that, but I don't recall seeing
19 that.
20    Q  Okay. Now, you testified that you previously
21 purchased Arizona Arnold Palmer that wasn't labeled
22 lite, correct?
23    A  Previously purchased Arizona -- I'm sorry.
24 What?

Page 79

1    Q  Did you purchase at any time an Arnold Palmer
2 Arizona product that was not labeled lite?
3    A  Yes.
4    Q  And when did you do that?
5    A  When I purchased the Arizona RX.
6    Q  I'm talking about the Arnold Palmer, sir.
7    A  Oh, no. No, I've never purchased Arnold
8 Palmer that didn't say lite. Sorry.
9    Q  If the Arnold Palmer Lite product that you
10 purchased was one third calories less than the
11 regular Arnold Palmer not labeled lite would you
12 agree that the reference to lite was true?
13       MR. SHEEHAN: Objection. Calls for legal a
14    conclusion. You may answer.
15    A  I would assume it, but I've never seen an
16 Arnold Palmer can that didn't say lite on it. In
17 this area at least.
18       (Deposition Exhibit P-7 marked
19       for identification.)
20    Q  (By Mr. Donovan) I'm going to show you P-7.
21    A  Okay.
22    Q  Have you ever seen that product before?
23    A  I have not. No, I've never seen one of
24 these.

Page 80

1    Q  Were you aware that, that Arizona sold an
2 Arnold Palmer not labeled lite?
3    A  No.
4    Q  Correct me if I'm wrong, I thought you said
5 you purchased an Arnold Palmer sweet tea. Did you or
6 no?
7    A  No. I said at restaurants. As far as
8 Arizona Arnold Palmers, no, they've always been
9 lite.
10    Q  Now I understand. So now my question is: If
11 the Arnold Palmer that you purchased, the Arnold
12 Palmer Lite that's the subject of this lawsuit, was,
13 in fact, less than one third calories than the other
14 Arnold Palmers that you purchased at restaurants,
15 would you consider yourself to have been deceived by
16 the lite label?
17    A  I'm sorry. I was trying to process that
18 question.
19    Q  My understanding is that your claim in this
20 case is that the lite label is false?
21    A  Correct.
22    Q  And it's -- and I thought you testified that
23 it's because it contained -- it wasn't as healthy as
24 you thought it was going to be.

Page 81

1    A  That's correct.
2    Q  And it didn't contain -- it contained more
3 calories than you thought it contained, right?
4    A  Correct.
5    Q  And my question to you is: If, in fact, the
6 Arnold Palmer Lite that you purchased was one third
7 less than the Arnold Palmer non-lite that you buy at
8 restaurants and such, would you consider yourself to
9 have been deceived?
10    A  Yes.
11    Q  Why?
12    A  Because it's labeled lite meaning that, you
13 know, again it would be a healthier option, not full
14 of the sugars that, you know, the other -- really I
15 guess for me not knowing that there is an Arnold
16 Palmer that's not considered lite, I can't really
17 make that judgment.
18    Q  Okay. So let's look at it this way or ask it
19 this way. How much lower in calories were you
20 looking to get in the Arnold Palmer Lite than
21 compared to the products not labeled lite?
22    A  So it's not so much that I was looking for,
23 you know, to go lower or looking for any number in
24 specific, just that I wanted it to be a healthier

21 (Pages 78 - 81)

Page 82

1  drink, not have as much sugar.  Even when I, I would
2  get it from restaurants I would ask for Arnold
3  Palmer unsweet tea with, you know, whatever lite
4  lemonade or if they have unsweetened lemonade or
5  whatever that they would have.
6      MR. DONOVAN:  Can you do me a favor please
7  and read back that answer?
8      (The requested portion of the
9      record read by the reporter.)
10     Q    (By Mr. Donovan) When you say as much
11  sugar -- do you have something to add?
12     A    No.  She said that and it should be they.
13     MR. DONOVAN:  Withdrawn.
14     Q    (By Mr. Donovan) When you say as much sugar
15  in that response, as much sugar as what?
16     A    As much sugar as -- so for me when I think
17  of Arnold Palmer I think of sweet tea and sweetened
18  lemonade and so it would have less calories compared
19  to those two.
20     Q    How much less calories?
21     A    Honestly I'm not sure.
22     Q    Do you know?
23     A    No.
24         (Deposition Exhibit P-8 marked

Page 83

1         for identification.)
2      Q    (By Mr. Donovan) Let me show you P-8.  Did
3  you ever purchase a product in that container, sir?
4      A    No.
5      MR. DONOVAN:  Can you get a video of that?
6      THE VIDEOGRAPHER:  I got it.  Do you want to
7  turn it around?  Thank you.
8      Q    (By Mr. Donovan) Did there come a point in
9  time that you discovered the sugar content of the
10  Arnold Palmer Lite?
11     A    Can you repeat that question?
12     MR. DONOVAN:  Can you read it to the
13  witness?
14     (The requested portion of the
15     record read by the reporter.)
16     A    Oh, yes.
17     Q    (By Mr. Donovan) When?
18     A    I can't remember if it was in 2018 or '19.
19     Q    And how did that come about in 2018 or '19?
20     A    Once I was told about my cholesterol I
21  started looking into other things with my health and
22  making sure that, you know, I wasn't consuming too
23  much sugars and things of that nature.  My diabetes
24  doesn't run rampantly in the family but it has been

Page 84

1  a thing in the family and so I wanted to make sure
2  that I was, you know, doing the right thing, eating
3  the right things, drinking the right things to at
4  lease help prevent becoming a diabetic.
5      Q    So around 2018, 2019 you became aware of the
6  sugar content of the Arnold Palmer Lite?
7      A    Yes.
8      Q    And when did you become aware of the calorie
9  content of the Arnold Palmer Lite?
10     A    Probably around the same time.  Just kind of
11  watching -- checking out the label.
12     Q    And that's how you found out by looking at
13  the label?
14     A    Yes.
15     Q    And around the same time you mean 2018, 2019?
16     A    Yes.
17     Q    And after you became aware of the sugar
18  content of the Arnold Palmer Lite did you continue to
19  purchase the product?
20     A    I did, but, of course, you know, it was the
21  healthier choice outside of water.
22     Q    And after discovering the calorie content of
23  the product in 2018, 2019 did you continue to
24  purchase the product?

Page 85

1      A    I can't recall my last purchase, but I know
2  it was after 2018, '19.
3      Q    2018?
4      A    I said it was after 2018, '19.  Sorry.  I'll
5  speak up.
6      Q    I just want the record to be clear.  After
7  you discovered the calorie content of the product you
8  continued to purchase the product?
9      A    Sorry.  I'm sorry.  I cannot even recall the
10  last date or the last time frame.
11     Q    Prior to 2018 was there anything preventing
12  you from looking at the label to determine what the
13  sugar content was of the Arnold Palmer Lite?
14     A    Yeah.  Well, there wasn't anything keeping
15  me from doing that.  I just didn't think of checking
16  it out at that time because at that time I was not
17  as conscious of checking out the label.
18     Q    The same is true about the calorie content,
19  was there anything preventing you from looking at
20  that prior to 2018, 2019?
21     A    No.  Just wasn't conscious of it.
22     Q    Why weren't you conscious of it, wasn't that
23  important?
24     A    No.  I thought I was young and I would live

22 (Pages 82 - 85)

Page 86

1  forever until the doctor told me otherwise.
2      Q   So it wasn't a priority?
3      A   It was not a priority.
4      Q   When you talk about the product, the Arnold
5  Palmer Lite product, what attributes do you think it
6  has?  Can you tell me?
7      A   So for me, the little education I have on
8  tea is that, you know, of course, tea is healthier
9  to drink.  Of course, anything, too much of anything
10  has its, you know, bad side.  But the Arnold Palmer
11  in particular, just enjoying the taste of tea and
12  lemonade combined and that's pretty much it.
13      Q   You liked the flavor?
14      A   Yeah.  Great flavor.
15      Q   What about the value?
16      A   I could spare $1.00 so, yeah, the value was
17  great.
18      Q   Would you agree that it probably has the
19  best, if not one of the best, values offered for an
20  ice tea line of products, the Arnold Palmer Lite?
21      A   I would say so.
22      Q   Did the product quench your thirst?
23      A   Yes.
24      Q   Did you like the attractiveness of the label,

Page 87

1  the artwork and such?
2      A   I mean, once I really took a look at the
3  can, yeah, I appreciated the artwork.
4      Q   Was taste one of the reasons why you bought
5  the product?
6      A   Yes.
7      Q   Was the value you mentioned one of the
8  reasons you bought the product?
9      A   Yes.
10      Q   Was trying to get your thirst quenched one of
11  the reasons why you bought the product?
12      A   Yes.
13      Q   You developed some familiarity with the
14  brand, correct?
15      A   I did.
16      Q   Was brand familiarity one of the reasons why
17  you bought the product?
18      A   Absolutely.
19      Q   And you mentioned the lite label is one of
20  the reasons why you bought the product?
21      A   Yes.  At some point, yes.
22      Q   At some point prior to 2018 you were buying
23  the product not because of the lite label, is that
24  fair to say?

Page 88

1      A   That's fair.
2      Q   Now, with respect to the lite thirst, flavor,
3  value, is there any one of those that was a
4  determative factor for the purchase?
5      A   When I most recently was purchasing it was
6  because of the lite label.  It was because of taking
7  health, you know, more serious.
8      Q   So the lite label took a predominant factor
9  over the other ones that you have said?
10      A   Yes.
11      Q   And when did that happen, 2018, 2019?
12      A   Approximately around that time all the way
13  up until the last purchase.
14              (Deposition Exhibit P-9 marked
15                  for identification.)
16      Q   (By Mr. Donovan) You mentioned earlier in
17  your deposition about gallons so I'm going to show
18  you P-9.  Did you ever buy the product in that
19  container?
20      A   Yes.  I have a few of those.
21      Q   I'm sorry?
22      A   I've purchased this a few times.
23      Q   When you say a few times, how many?
24      A   I don't remember off the top of my head how

Page 89

1  many times I purchased.
2      Q   Can you give me an estimate?
3      A   If I had to make an estimation or even a
4  guess --
5      Q   I'm not looking for a guess now.
6      A   Well, then I can't give you an estimate.
7      Q   Do you remember where you purchased the
8  product in the gallon container like E-9?
9      A   Gallon containers like that typically would
10  come from, I would purchase at Schnucks and
11  Dierbergs.
12      Q   Do you know what the price would be when you
13  bought this, P-9?
14      A   I don't recall.  Because that's not the only
15  thing I would purchase so I don't recall.
16      Q   Did you ever purchase any of the Defendant's
17  products on the Defendant's website?
18      A   No.
19      Q   Did you ever review their website?
20      A   No.  You know what, actually I did.  A long
21  time ago.  That's when I noticed they had, you know,
22  such bottles that were not -- I couldn't find in
23  this area.
24      Q   When you say such bottles, what do you mean?

23 (Pages 86 - 89)

Page 90

1    A  I forgot.  Is that P-4?

2    Q  P-7 you mean?

3    A  P-7.  And also the one that has the golf
4  ball shape.

5    Q  The P-8?

6    A  Yeah.

7    Q  And you noticed these and you didn't notice
8  them before you could buy them?

9    A  Yeah.  So here, you know, the cans, the one
10  gallon, and there's like a more cylinder bottle that
11  you can purchase here.  I have not seen those.  I
12  did see some cool things again on the website that I
13  never seen here.

14    Q  So let's go back to -- you had previously
15  testified you bought them in cans and in gallons.

16    A  Correct.

17    Q  Is there any other container size that you
18  know that you purchased the product in?

19    A  Yes.  It's a smaller bottle.  A little
20  bigger than this water bottle.

21    Q  Any other containers?

22    A  Again, as I was saying, the bottle, that
23  size bottle, far and few because I prefer the can
24  over the bottle if I was going to buy a smaller

Page 91

1  size.

2    Q  All right.  Just to recap.  You bought the
3  product, the lite product, because of taste, because
4  of value, to quench your thirst, because of brand
5  familiarity, and because of the lite label?

6    A  Correct.

7    Q  Any other reason?

8    A  That would pretty much be it.

9    Q  Can you refer back to the answers to
10  interrogatories.  P-4.  Look at interrogatory number
11  16.  The question reads:  State the date you first
12  came to believe you were deceived by Defendant with
13  regards to the product.  The answer is:  Plaintiff
14  cannot recall the date he first came to believe he
15  was deceived by Defendant but it was around
16  February 2020.  Do you see that?

17    A  Yes.

18    Q  Is that true and correct?

19    A  Yeah.  A little before that but, yeah.

20    Q  Could have been a little before February of
21  2020?

22    A  Yes.

23            (Deposition Exhibit P-10 marked

24            for identification.)

Page 92

1    Q  (By Mr. Donovan) I'm going to show you
2  P-10, sir.

3        MR. SHEEHAN:  Thank you.

4    Q  (By Mr. Donovan) Can you identify that
5  document for me?

6    A  It says United States District Court,
7  Southern District of Illinois, East St. Louis,
8  Division.

9    Q  Have you ever seen this document before,
10  P-10?

11    A  Honestly they're all starting to look the
12  same.  Yes.

13    Q  When do you first recall seeing it?

14    A  I'm not sure.  Whenever Mr. Sheehan's office
15  sent it over.

16    Q  Do you recall reviewing a complaint before it
17  was filed in this case?

18    A  No.

19    Q  So is it fair to say that the first time you
20  got a copy of P-10 is after it was filed?

21    A  Yes.

22    Q  Let me direct your attention to paragraph 71.
23  It's an allegation about Arizona products being
24  recognized worldwide for their elaborate and unique

Page 93

1  artwork, rendering them instantly identifiable by
2  consumers.  Do you see that?

3    A  Yes.

4    Q  Do you agree with that assertion that you
5  made?

6    A  Yes.

7    Q  And paragraph 73 refers to you purchasing the
8  product at BP stations between January 2021 and
9  January 2022.  Is that a true statement?

10    A  That is true.

11        MR. DONOVAN:  I have to take a bathroom
12  break if that's okay?

13        MR. SHEEHAN:  No problem.  Sure.

14        MR. DONOVAN:  Five minute break.

15        THE VIDEOGRAPHER:  Off the record at 1:34.

16            (Recess)

17        THE VIDEOGRAPHER:  We're back on the record.
18  This is media unit number four.  The time is
19  1:39.

20            (Deposition Exhibit P-11 marked

21            for identification.)

22    Q  (By Mr. Donovan) I'm going to show you a
23  document marked P-11, sir, and ask you if you've
24  ever purchased a product bearing that label?

24 (Pages 90 - 93)

Page 94

1      MR. SHEEHAN: Thank you.
2    A   Yes.
3    Q   (By Mr. Donovan) When?
4    A   Multiple times on multiple occasions.
5    Q   How many times?
6    A   I am not sure.
7    Q   When you say you're not sure, do you know?
8    A   It's a drink that I've had quite a bit, once
9  or twice a week or even -- yeah, probably about
10  twice a week or so so I can't recall it.
11    Q   Can you tell me how many times you purchased
12  the product bearing the label on P-11?
13    A   At least once a week.
14    Q   For what time period?
15    A   For a few years. All the way up to, I
16  guess, about 2020. I can't tell you how far back.
17    Q   Up until when 2020?
18    A   Well, actually it was between 19 -- no.
19  Maybe it wasn't 2020. '21 was the last purchase.
20  That was a traumatic period for me so I try not to
21  remember a lot of things during that time.
22    Q   Traumatic in what way, sir?
23    A   A lot of personal things happened in my life
24  during that time.

Page 95

1    Q   I started this deposition by telling you it's
2  going to get a little personal for putative class
3  representative of a number of states. So I'm going
4  to have to ask you, and we can just designate this
5  highly confidential, what personal matters are you
6  referring to?
7      (The following testimony is an excerpt
8  designated "For Attorneys' Eyes Only")
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 96

1
2
3
4
5
6
7
8
9
10
11
12
13    Q   So we got on this tract with me asking you
14  about P-11 and you said you stopped purchasing it in
15  2020. And I asked you when in 2020, you said I'm not
16  sure, maybe it's 2021. So when did you start
17  purchasing a product labeled like P-11?
18    A   When did I start? Honestly I don't
19  remember. I've been drinking Arizona for a long
20  time so I don't recall.
21    Q   Okay. And how much money have you expended
22  on the product depicted in P-11?
23    A   So for a can or some -- well, the can is
24  labeled 99 cents, the smaller bottle is labeled

Page 97

1  $1.00. The larger jugs that I've purchased, so
2  there's no labels, I don't recall what I paid for
3  those.
4    Q   Okay.
5    A   And it wasn't as often in purchasing the jug
6  as much as the can.
7    Q   And are you saying that you purchased P-11,
8  the 20 ounce -- it's 20 ounces, right?
9    A   Yes.
10    Q   Are you saying you purchased the 20 ounce
11  once a week or you purchased the can once a week?
12    A   So I purchased the can at least once a week.
13    Q   So that's 20 ounces on P-11, right?
14    A   Yes.
15    Q   Did you ever purchase a product bearing that
16  label?
17    A   When you break it down to the ounces I
18  cannot confirm that.
19    Q   So do you know?
20    A   No.
21    Q   So is it fair to say the only products that
22  you know for sure that you purchased were the gallon
23  container, the P-9, and the 23 ounce P-5, is that
24  fair to say?

25 (Pages 94 - 97)

Page 98

1    A  No.  That's not fair to say.
2    Q  Okay.  What other containers do you remember
3  purchasing?
4    A  Again, there's a bottle that's labeled $1.00
5  that's just a little larger than this water bottle
6  sitting in front of me.
7    Q  And you don't know whether or not it was 20
8  ounces?
9    A  I think water bottles are, what, something
10  like 16?  It probably was 20 ounces.
11    Q  Sorry?
12    A  It could have easily been a 20 ounce bottle.
13    Q  You don't know?
14    A  No.
15        (Deposition Exhibit P-12 marked
16        for identification.)
17    Q  (By Mr. Donovan) Let me show you what's
18  been marked P-12.  Let me move these out of the way
19  so the videographer can see.  Have you ever
20  purchased a product in that container size?
21    A  Yes.
22    Q  Okay.  When?
23    A  I'm not sure of when.  Whenever, like I
24  said, whenever the can wasn't available I would go

Page 99

1  ahead and get the 20 ounce bottle here.
2    Q  Can you tell me dates that you purchased the
3  product bearing --
4    A  I can't.
5    Q  Let me finish.  P-12, can you tell me when?
6    A  I can't give you dates.
7    Q  Can you tell me where you purchased the
8  product bearing the label P-12?
9    A  It would have been at a BP or Mobile.
10    Q  BP where?
11    A  Likely the one on Rauckman.
12    Q  What about the Mobile station?
13    A  Likely the one on St. Louis Avenue.
14    Q  Where, what city or town?
15    A  St. Louis, Missouri.  And it's Caseyville,
16  Illinois for the one on Rauckman.
17    Q  So the BP station was in Illinois and the
18  Mobile station is in St. Louis, Missouri?
19    A  Yes.
20    Q  And you testified, correct me if I'm wrong,
21  that you would buy P-12 when the cans were not
22  available?
23    A  Yes.  Only if the cans weren't available.
24    Q  Okay.  You would only purchase it if the cans

Page 100

1  were not available, is that correct?
2    A  Correct.
3    Q  And with respect to P-12, do you know how
4  much money you've expended buying the product P-12?
5    A  Not offhand.
6    Q  Would it be fair to say that the reason that
7  you bought or a determinative factor for the reason
8  you bought P-12 is because the cans were not
9  available?
10    A  That's correct.
11    Q  So other than the gallon, the 20 ounce, and
12  the can, are there any other containers of the Arnold
13  Palmer Lite that you purchased?
14    A  No.
15      MR. DONOVAN:  Give me a minute to look
16  through my notes.  We'll take a quick break for
17  five minutes.
18      MR. SHEEHAN:  Sure.  No problem.  Thank you.
19      THE VIDEOGRAPHER:  Off the record at 1:52.
20        (Recess)
21      THE VIDEOGRAPHER:  We're back on the record.
22  This is media unit number five.  The time is
23  1:54.
24    Q  (By Mr. Donovan) Mr. Crawford, you

Page 101

1  understand this is a proposed class action, you know
2  that, right?
3    A  That is correct.
4    Q  And do you understand that you have some
5  duties as a class representative?
6    A  Sure.
7    Q  What are they?
8    A  To -- oh, man.  Pretty much to just testify,
9  you know, my stance on the label being false or
10  giving false hope.
11    Q  Do you think you have an obligation to be
12  aware of the proceedings in the case?
13    A  Can you explain that little more?
14    Q  The decisions that courts makes.
15    A  After -- I mean.  I'm sorry.  I'm trying
16  to --
17    Q  I'll withdraw the question.
18      Other than testifying is there anything
19  else you can think of that you have a duty to tend
20  to as class representative?
21    A  Not necessarily.
22      MR. DONOVAN:  I have nothing further, sir.
23  Thank you very much for your time.  And again I
24  thank you for agreeing to appear in person.

Page 102

1    With these days I understand that that's a
2    sacrifice. I appreciate it.
3        MR. SHEEHAN: May I ask a few questions?
4        MR. DONOVAN: You may.
5            EXAMINATION
6    QUESTIONS BY MR. SHEEHAN:
7    Q    (By Mr. Sheehan) Mr. Crawford, thank you
8    again for appearing here. I am your attorney in
9    this case and I have some questions just to clarify
10   some points.
11   A    Okay.
12   Q    And, of course, after I finish them
13   Mr. Donovan may wish to ask a couple follow-ups,
14   perhaps.
15   A    Okay.
16   Q    Mr. Crawford, I have in my hand the
17   representation agreement that is dated December 19,
18   2021; and also the date of my signature, February 5,
19   2022. Now, this complaint, Mr. Crawford, was dated
20   February 6, 2022.
21   A    Correct.
22   Q    Do you recall if I spoke to you on the
23   telephone before I signed the agreement?
24   A    Actually we did speak on the telephone

Page 103

1    before you signed.
2    Q    Okay. And in that telephone call can you
3    inform us whether or not I described to you the
4    things that would be in the complaint that would be
5    filed?
6        MR. DONOVAN: Objection to form. Leading.
7    You may answer if you can.
8    A    So actually, if I can say, as we were on
9    lunch some things came back to me and I remembered
10   the conversation and I remember you stating that you
11   would not -- you hadn't signed it or anything
12   because we hadn't actually spoken. I think it was
13   more or less me speaking with your office assistant.
14       MR. DONOVAN: Signed what?
15       MR. SHEEHAN: This document, this document.
16       MR. DONOVAN: What's it marked?
17       MR. SHEEHAN: February 5.
18       MR. DONOVAN: Thank you.
19       MR. SHEEHAN: And we'll get you a copy of
20   that audit log.
21       MR. DONOVAN: Sure.
22   Q    (By Mr. Sheehan) On that telephone call did
23   you tell me that I had your consent to file a
24   complaint about this?

Page 104

1    A    That is correct.
2    Q    Okay. I want to draw your attention to the
3    document exhibit entitled P-4?
4    A    Okay.
5    Q    Now, if you can turn to interrogatory number
6    5. And the response to interrogatory number 5 which
7    is, I will note substantially similar to
8    interrogatory number 16.
9        MR. DONOVAN: Objection to form.
10       MR. SHEEHAN: Okay.
11   Q    (By Mr. Sheehan) Now, Mr. Crawford, on this
12   document it says that Plaintiff does not recall the
13   date when you stopped purchasing the product, but it
14   is likely around February 2020.
15   A    Yes.
16   Q    Now, on this document here, this
17   representation agreement which you signed on
18   December 19, 2021, it says that you purchased this
19   product less than a week ago. So would that be in
20   December of 2021?
21       MR. DONOVAN: Objection to form. You can
22   answer if you can.
23   A    Yes, it would.
24   Q    (By Mr. Sheehan) Okay. So these two dates

Page 105

1    are different, December of 2021 and February of
2    2020, can both of those things be true or --
3        MR. DONOVAN: Objection. Form.
4    A    Yes. They are true.
5    Q    (By Mr. Sheehan) Okay. Is it possible that
6    this February 2020 was a typographical error because
7    this complaint was filed in February of 2022?
8        MR. DONOVAN: Objection to form.
9    A    Yes.
10   Q    (By Mr. Sheehan) Okay. Is one of your
11   goals in this case to try to prevent misleading
12   labeling?
13   A    Yes.
14       MR. DONOVAN: Objection to form.
15   Q    (By Mr. Sheehan) Do you want anything from
16   this case more than everybody else from the class
17   gets?
18   A    No.
19   Q    Okay. Do you believe you have the honesty to
20   represent other purchasers of this product?
21   A    I'm sorry. Can you repeat that?
22   Q    Do you believe you have the honesty and
23   integrity to represent other purchasers?
24   A    Yes.

27 (Pages 102 - 105)

Page 106

1  Q  And what does that mean to you about having
2  the honesty to represent others?
3     A  Primarily that everything that I've stated
4  about the purchases is true. Having the idea that
5  lite was misleading and that, you know, I thought it
6  was a healthier alternative so, yes, I think that.
7     Q  Do you believe that any resolution to this
8  action should benefit everyone?
9        MR. DONOVAN: Objection to form. Leading.
10        MR. SHEEHAN: You can answer.
11     A  I'm sorry. Can you repeat your question?
12     Q  (By Mr. Sheehan) Do you believe or is your
13  goal to represent and help everyone?
14     A  Yes.
15        MR. DONOVAN: Same objection.
16     Q  (By Mr. Sheehan) Do you believe that
17  because of the label on the product that says lite
18  you paid more for the product or less?
19        MR. DONOVAN: Objection to form.
20     A  No. I think it was a fair price.
21     Q  (By Mr. Sheehan) But if the product was
22  labeled in a way that was misleading, is it possible
23  that maybe it cost more, you know, a small fraction
24  because of, you know, what you described as not

Page 107

1  being misleading?
2        MR. DONOVAN: Objection to form. No
3  foundation. Expert opinion.
4        MR. SHEEHAN: Okay. That's fair.
5     Q  (By Mr. Sheehan) Do you recall if my
6  office, and we can confirm this, provided you a copy
7  of the complaint by email after it was filed?
8     A  Yes.
9     Q  Okay. Do you recall if following the judge's
10  decision on the motion to dismiss the case, did you
11  recall receiving an email from me or my office that
12  contained the judge's decision?
13     A  No. I just don't recall.
14     Q  Okay. But it's possible that you did,
15  correct?
16        MR. DONOVAN: Objection to form.
17     A  Correct.
18     Q  (By Mr. Sheehan) Do you recall how much
19  time we spoke on the phone before this case was
20  filed when I first spoke to you? If you don't
21  recall, that's fine.
22     A  If I had to give a guess maybe an hour.
23     Q  Okay. Do you recall if we discussed this
24  document, the attorney representation agreement, I

Page 108

1  don't know the number?
2        MR. DONOVAN: P-2.
3     Q  (By Mr. Sheehan) P-2.
4     A  Yes. I recall that.
5     Q  Okay. Did you read where it says
6  responsibilities of -- I don't know if you have that.
7     A  I do.
8     Q  Did you read these responsibilities of the
9  named Plaintiff?
10     A  Yes.
11     Q  Okay. Did you read this statement here where
12  it says be proud to represent consumers?
13     A  Yes.
14     Q  And what did that mean to you when you read
15  it?
16     A  That I would have an attorney present, you
17  know, that would represent me and give legal advice.
18     Q  And are you aware as Mr. Donovan said, that
19  this is a proposed class action?
20     A  Correct.
21     Q  And that means that you are representing
22  others?
23     A  Other people, correct.
24        MR. DONOVAN: Objection to form.

Page 109

1     Q  (By Mr. Sheehan) Okay. Almost done. Just
2  give me a minute. Were you promised any money by me
3  to be a plaintiff?
4     A  No.
5     Q  Now, Mr. Crawford, you previously indicated
6  that you became aware of the sugar and calorie
7  content of the product prior to even connecting with
8  me, is that correct?
9     A  Yes.
10        MR. DONOVAN: Objection to form.
11     A  That is correct.
12     Q  (By Mr. Sheehan) Is it correct though,
13  Mr. Crawford, that you did not become aware of what
14  is in the complaint of how the lite claim was
15  misleading?
16        MR. DONOVAN: Objection to form.
17        MR. SHEEHAN: I don't understand the
18        objection.
19        MR. DONOVAN: You're leading the witness and
20        suggesting the answer. It's totally improper.
21        MR. SHEEHAN: Well, I would disagree.
22     Q  (By Mr. Sheehan) But anyway, did you know
23  that the lite claim was misleading that was separate
24  from the calories and sugar, was the lite claim

28 (Pages 106 - 109)

Page 110

1  different than calories and sugar?
2      MR. DONOVAN: Objection to form.
3    Argumentative and leading.
4    A  That the lite claim would be different from
5  the calories? Honestly, no, it was all looped in
6  together for me.
7    Q  (By Mr. Sheehan) Okay. Is it your
8  understanding or recollection, Mr. Crawford, that
9  all of the versions of the product did not have the
10  statement about one third less? I believe
11  Mr. Donovan showed you this, P-11. Does this label
12  anywhere say anything about one third less if you
13  look closely?
14      MR. DONOVAN: Objection to form.
15    A  It doesn't say anything about one third
16  less.
17    Q  (By Mr. Sheehan) Okay.
18      MR. SHEEHAN: I don't believe I have
19  anything else. Thank you, Mr. Crawford.
20      MR. DONOVAN: I have nothing. Thank you,
21  sir, again.
22      THE VIDEOGRAPHER: We are off the video
23  record at 2:09.
24      (Off the record.)

Page 111

1      MR. DONOVAN: We're back on the record.
2  Counsel is reserving his rights under the rules
3  to review and sign, right?
4      MR. SHEEHAN: Yes, of course.
5      MR. DONOVAN: The actual reservation is -- I
6  got to clarify because I can't speak for you.
7  What do you want to reserve the right for?
8      MR. SHEEHAN: Isn't there just a standard
9  thing when a party receives a deposition
10  transcript?
11      MR. DONOVAN: The 30 day review period?
12      MR. SHEEHAN: Something like that, yeah. If
13  there's any errata. Isn't that standard stuff?
14      MR. DONOVAN: Thanks. That's all you're
15  talking about?
16      MR. SHEEHAN: Yeah. As opposed to what? I
17  don't know what else there could be.
18      MR. DONOVAN: Okay. We're done.
19      MR. SHEEHAN: I do not need a rush copy. I
20  would like a standard copy with index, you
21  know, regular copy PDF, no hard copies, and the
22  one that has the four on one page.
23
24

Page 112

1  State of Illinois
2        SS.
3  County of Macoupin
4    I, Nancy Prange, a Notary Public in and for
5  the State of Illinois, duly commissioned, qualified
6  and authorized to administer oaths and to certify to
7  depositions, do hereby certify that pursuant to
8  Notice in the civil cause now pending and
9  undetermined In The United States District Court,
10  Southern District of Illinois, East St. Louis
11  Division, to be used in the trial of said cause in
12  said court, I was attended at the offices of
13  Gausnell, O'Keefe & Thomas, LLC, 1717 Park Avenue,
14  in the City of St. Louis, State of Missouri, by the
15  aforesaid attorneys; on the 13th day of February,
16  2023.
17      The said witness, being of sound mind and
18  being by me first carefully examined and duly
19  cautioned and sworn to testify the truth, the whole
20  truth, and nothing but the truth in the case
21  aforesaid, thereupon testified as is shown in the
22  foregoing transcript, said testimony being by me
23  reported in shorthand and caused to be transcribed
24  into typewriting, and that the foregoing pages

Page 113

1  correctly set forth the testimony of the
2  aforementioned witness, together with the questions
3  propounded by counsel and remarks and objections of
4  counsel thereto, in all respects a full,
5  true, correct and complete transcript of the
6  questions propounded to and the answers given by
7  said witness; that signature of the deponent was not
8  waived by agreement of counsel.
9    I further certify that I am not of counsel or
10  attorney for either of the parties to said suit, not
11  related to nor interested in any of the parties or
12  their attorneys.
13      Witness my hand and notarial seal at New
14  Douglas, Illinois, this 27th day of February, 2023.
15  My Commission expires May 11, 2024.
16
17  _Nancy Meyers Prange_
17  --------------------------------------
18      Notary Public in and for the
19      State of Illinois
20
21
22
23
24

Veritext Legal Solutions
800-227-8440                                    973-410-4040

Page 114

1 Crawford, Kenneth v. Arizona Beverages Usa Llc, Et Al

2 Kenneth Crawford (#5703163)

3      E R R A T A  S H E E T

4 PAGE_____ LINE_____ CHANGE_____

5 _____

6 REASON_____

7 PAGE_____ LINE_____ CHANGE_____

8 _____

9 REASON_____

10 PAGE_____ LINE_____ CHANGE_____

11 _____

12 REASON_____

13 PAGE_____ LINE_____ CHANGE_____

14 _____

15 REASON_____

16 PAGE_____ LINE_____ CHANGE_____

17 _____

18 REASON_____

19 PAGE_____ LINE_____ CHANGE_____

20 _____

21 REASON_____

22

23 _____     _____

24 Kenneth Crawford           Date

Page 115

1 Crawford, Kenneth v. Arizona Beverages Usa Llc, Et Al

2 Kenneth Crawford (#5703163)

3     ACKNOWLEDGEMENT OF DEPONENT

4    I, Kenneth Crawford, do hereby declare that I

5 have read the foregoing transcript, I have made any

6 corrections, additions, or changes I deemed necessary as

7 noted above to be appended hereto, and that the same is

8 a true, correct and complete transcript of the testimony

9 given by me.

10

11 _____     _____

12 Kenneth Crawford           Date

13 *If notary is required

14     SUBSCRIBED AND SWORN TO BEFORE ME THIS

15     _____ DAY OF _____, 20___.

16

17

18     _____

19     NOTARY PUBLIC

20

21

22

23

24

[& - 23]    Page 1

| & | | | |
|---|---|---|---|

**&**    1:21 2:19 3:5
   3:13 5:11
   112:13

| 0 |
|---|

**00220**   1:9 2:11
   5:10
**07407**   3:15
**08**   15:16
**084-004426**
   2:22

| 1 |
|---|

**1**   4:8 36:17,20
   37:1 55:10
   59:16
**1.00**   60:1,18
   86:16 98:4
**1.00.**   97:1
**10**   4:19 11:13
   12:17 32:3
   62:24 75:22
   91:23 92:2,10
   92:20
**100**   56:19
**10:00**   1:18
**10:11**   5:2
**11**   4:20 12:17
   12:17 22:14
   93:20,23 94:12
   96:14,17,22
   97:7,13 110:11
   113:15
**11021-3104**   3:7

**112**   4:4
**11:39**   64:14
**11:49**   64:18
**12**   4:22 12:4
   98:15,18 99:5
   99:8,21 100:3
   100:4,8
**12:06**   73:4
**12:58**   73:8
**13**   1:17 5:2
   12:17 16:5
   39:18
**13th**   2:21
   112:15
**14**   16:5
**159**   36:14
**16**   91:11 98:10
   104:8
**16522**   113:16
**17**   38:6 57:11
**1717**   1:22 2:19
   5:12 112:13
**18**   27:5,6
**19**   47:15,18
   50:20 52:10,12
   52:19,24 53:3
   83:18,19 85:2
   85:4 94:18
   102:17 104:18
**1986**   17:8,9
**1:34**   93:15
**1:39**   93:19
**1:52**   100:19
**1:54**   100:23

| 2 |
|---|

**2**   4:9 13:19,21
   13:24 45:11,19
   46:14 47:5,9
   48:17,23 59:10
   59:12,13,19,20
   64:20 66:8,8
   68:2 108:2,3
**2.50**   60:18
**2.50.**   60:1
**20**   4:16,20,22
   97:8,8,10,13
   98:7,10,12
   99:1 100:11
   115:15
**2007**   15:16
**2008**   15:16,24
   27:17,19,23,24
   42:6
**2009**   42:6
**201**   3:14,16
**2010**   38:7
**2011**   12:11
   16:5 28:2
**2014**   16:13
   17:1
**2017**   27:5,6
   32:18 36:10,16
   38:5 73:20
**2018**   56:13
   73:18 83:18,19
   84:5,15,23
   85:2,3,4,11,20
   87:22 88:11

**2019**   18:23
   35:20 39:22
   57:14 73:16
   84:5,15,23
   85:20 88:11
**2020**   73:14
   91:16,21 94:16
   94:17,19 96:15
   96:15 104:14
   105:2,6
**2021**   18:22
   46:15 47:15,18
   50:20 52:6,10
   52:13,20,24
   53:3 93:8
   96:16 102:18
   104:18,20
   105:1
**2022**   12:4
   40:16 50:17,23
   51:2,5,9,20,24
   57:14 93:9
   102:19,20
   105:7
**2023**   1:17 2:21
   5:2 112:16
   113:14
**2024**   113:15
**21**   46:2 47:14
   48:20 94:19
**23**   17:8,9 64:24
   65:1 66:16
   67:9,12 76:11
   97:23

**[230 - address]**                                                          Page 2

| | | | |
|---|---|---|---|
| **230**  17:18 | 70:7,22 72:5 | **73**  37:5 93:7 | **accurate**  39:9 |
| **241-6750**  3:24 | 72:10 77:24 | **74**  37:5,6,15 | 39:10 60:3 |
| **25**  39:22 | 78:16 97:23 | 39:18 | **acknowledge...** |
| **268-7080**  3:8 | 102:18 103:17 | **778**  2:22 | 115:3 |
| **27th**  113:14 | 104:6,6 | **79**  4:15 | **action**  41:7,12 |
| **28**  37:15 | **5'9**  17:17 | | 42:10 101:1 |
| **2:09**  110:23 | **50**  57:13,17,22 | **8** | 106:8 108:19 |
| **3** | **500**  56:19 | **8**  4:16 82:24 | **actions**  42:13 |
| **3**  4:10 54:19,22 | **516**  3:8 | 83:2 90:5 | **actual**  14:2 |
| **30**  11:9 111:11 | **54**  4:11 | **83**  4:17 | 23:15 71:20 |
| **310**  3:22 | **5703163**  114:2 | **857-6778**  3:16 | 111:5 |
| **314**  3:24 | 115:2 | **88**  4:18 | **actually**  11:7 |
| **32**  4:13 13:11 | **58**  4:12 | **9** | 18:7 19:12 |
| 13:13,17 60:15 | **6** | **9**  4:18 88:14,18 | 20:7 24:23 |
| **3209**  13:1 | **6**  4:3,14 57:13 | 89:8,13 97:23 | 25:10,24 27:9 |
| **36**  4:8 | 57:14 69:10,12 | **91**  4:19 | 28:21 36:3 |
| **3:22**  1:9 2:11 | 102:20 | **93**  4:21 | 37:5 38:1,2,15 |
| 5:10 | **60**  3:6 | **98**  4:22 | 40:19 41:11 |
| **4** | **62203**  13:11 | **99**  61:6 67:17 | 42:20 47:6 |
| **4**  4:12 50:6 | **62221**  13:2 | 72:7 96:24 | 50:16 51:23 |
| 58:7,9,24 90:1 | **62226**  13:20 | **a** | 64:10 65:22 |
| 91:10 104:3 | **63**  39:18 | **a.m.**  1:18 | 74:22 76:1 |
| **4.1.**  37:19 | **63101**  3:23 | **ability**  6:18 | 89:20 94:18 |
| **4.2.**  37:21 | **669**  3:14 | **above**  115:7 | 102:24 103:8 |
| **4.3**  37:24 | **67**  4:13 | **absolutely** | 103:12 |
| **40**  11:22 | **69**  4:14 | 43:14 48:7 | **ad**  40:19,20 |
| **409**  3:6 | **7** | 61:21 87:18 | 44:9 |
| **42**  39:13 | **7**  4:15 50:10 | **access**  47:1 | **add**  77:13,14 |
| **45**  4:9 | 79:18,20 90:2 | **accident**  36:1,9 | 82:11 |
| **5** | 90:3 | 36:11,13 | **additions**  115:6 |
| **5**  4:13 12:11 | **701**  3:22 | **accommodate** | **address**  12:23 |
| 13:19 50:8,13 | **71**  92:22 | 9:18 | 12:24 13:10,14 |
| 50:15,23,24 | **72**  37:6 | **account**  31:18 | 13:17,22 14:2 |
| 53:5 67:2,5 | | 31:20 34:22 | 14:9 15:9 16:6 |
| | | 35:1,4 | 16:9 20:3,4 |

| | | | |
|---|---|---|---|
| 26:5 49:1,5,7<br>53:21 70:1<br>**addressing**<br>6:13<br>**administer**<br>112:6<br>**admissions**<br>4:11<br>**admit** 11:8<br>55:10 57:12,14<br>**admits** 55:12<br>**adult** 32:10<br>**advance** 8:19<br>**advertisement**<br>41:1,4 42:18<br>42:21 43:12<br>51:8,14,20<br>**advice** 108:17<br>**affiliated** 49:14<br>**aforemention...**<br>113:2<br>**aforesaid** 6:3<br>112:15,21<br>**afternoon** 73:9<br>**age** 6:1 14:16<br>**ages** 12:16<br>**ago** 19:10<br>20:22 41:13<br>75:22 89:21<br>104:19<br>**agree** 79:12<br>86:18 93:4<br>**agreeing** 8:10<br>101:24 | **agreement** 4:9<br>66:8 102:17,23<br>104:17 107:24<br>113:8<br>**ahead** 99:1<br>**al** 114:1 115:1<br>**aldi's** 29:5,6<br>**allegation**<br>92:23<br>**alternative**<br>76:3 77:6,16<br>106:6<br>**altogether**<br>11:18<br>**america** 32:1<br>**amount** 10:16<br>56:18<br>**amounts** 7:8<br>**answer** 6:19<br>7:2,13 9:2,3<br>33:10 43:2<br>46:4 52:23<br>64:20 65:16<br>79:14 82:7<br>91:13 103:7<br>104:22 106:10<br>109:20<br>**answered** 9:17<br>51:11<br>**answering** 43:1<br>43:5<br>**answers** 4:12<br>7:10,21,23,23<br>58:16,19,24<br>91:9 113:6 | **anticipating**<br>7:15<br>**anybody** 74:1,4<br>**anymore** 29:9<br>**anyway** 38:16<br>109:22<br>**apartment**<br>13:19<br>**apologize** 10:5<br>27:24 28:1<br>**appear** 8:10<br>101:24<br>**appearances**<br>3:1<br>**appearing**<br>102:8<br>**appended**<br>115:7<br>**appointment**<br>44:23,24<br>**appreciate** 9:21<br>102:2<br>**appreciated**<br>87:3<br>**approximate**<br>11:2 40:18<br>56:11 60:13<br>**approximately**<br>14:10 17:17<br>88:12<br>**approximation**<br>62:21<br>**approximatio...**<br>7:9 | **area** 18:1 79:17<br>89:23<br>**argumentative**<br>110:3<br>**arizona** 1:11<br>2:13 5:6 40:22<br>40:22 43:7<br>49:13 57:4<br>64:8 71:9,17<br>72:21 78:21,23<br>79:2,5 80:1,8<br>92:23 96:19<br>114:1 115:1<br>**arizona's** 43:13<br>**army** 25:11,13<br>**arnold** 4:13,15<br>4:16,18,20,22<br>15:3,4,7 33:4<br>33:14,17 34:19<br>40:23 56:5,12<br>56:14,15 60:23<br>70:5,9,14,18<br>71:2,6,16 72:1<br>73:13,22 74:2<br>74:5,12 75:4,8<br>75:9,10 76:10<br>76:14 77:14,24<br>78:21 79:1,6,7<br>79:9,11,16<br>80:2,5,8,11,11<br>80:14 81:6,7<br>81:15,20 82:2<br>82:17 83:10<br>84:6,9,18<br>85:13 86:4,10 |

[arnold - bones]                                                    Page 4

| | | | |
|---|---|---|---|
| 86:20 100:12 | 108:16 113:10 | 23:6 27:18,20 | **behavior** 23:19 |
| **article** 68:15 | **attorneys** 95:8 | 28:1,1 32:13 | 24:2,7 |
| **artificial** 19:12 | 112:15 113:12 | 57:24 64:16,19 | **bel** 20:13,14,18 |
| **artwork** 87:1,3 | **attractiveness** | 64:21 66:7 | **belief** 43:19 |
| 93:1 | 86:24 | 72:5 73:6 76:2 | **believe** 13:11 |
| **ashley** 15:1 | **attributed** 71:1 | 78:16 82:7 | 40:2 67:15 |
| **asked** 34:5 48:5 | 71:3 | 90:14 91:9 | 69:15 91:12,14 |
| 51:10 54:11 | **attributes** 86:5 | 93:17 94:16 | 105:19,22 |
| 55:16,16 96:15 | **attrition** 9:18 | 100:21 103:9 | 106:7,12,16 |
| **asking** 7:7 | **audit** 53:20 | 111:1 | 110:10,18 |
| 96:13 | 103:20 | **bad** 86:10 | **benefit** 106:8 |
| **asks** 55:10 | **authorized** | **ball** 4:16 90:4 | **best** 86:19,19 |
| 57:12 | 112:6 | **ballpark** 62:24 | **better** 21:12,15 |
| **assertion** 93:4 | **available** 98:24 | **bank** 31:18,20 | 21:18,20,21,24 |
| **assistant** 21:13 | 99:22,23 100:1 | 32:1 37:18 | 63:20 |
| 23:8 44:22 | 100:9 | **bankruptcy** 4:8 | **beverage** 49:13 |
| 103:13 | **avenue** 1:22 | 35:14,17 37:3 | 70:6,14 71:4,7 |
| **associates** 3:5 | 2:19 5:12 | 37:12 | 71:13,16 |
| **assume** 39:11 | 99:13 112:13 | **barnes** 41:20 | **beverages** 1:11 |
| 44:4 79:15 | **avoid** 7:15 | 41:22,24 42:10 | 2:13 5:6 114:1 |
| **asthma** 18:13 | **aware** 33:5 | **based** 11:21 | 115:1 |
| 18:14 19:1,7 | 70:14 71:1 | 48:11 55:20 | **beyond** 19:22 |
| **attend** 18:9 | 80:1 84:5,8,17 | **basic** 6:14,21 | 19:23 20:6,20 |
| **attended** 18:3,6 | 101:12 108:18 | **basis** 66:1,24 | 21:2 22:3 |
| 112:12 | 109:6,13 | 67:13 | **bible** 16:21 |
| **attention** 66:7 | **awhile** 29:6,11 | **bathroom** | 17:2,19 18:3 |
| 70:5 92:22 | **b** | 93:11 | **biblical** 16:23 |
| 104:2 | | **bearing** 93:24 | **big** 29:13 |
| **attorney** 4:9 | **b** 20:15,17 | 94:12 97:15 | **bigger** 90:20 |
| 6:11 7:11,14 | 28:14 41:24 | 99:3,8 | **birth** 17:7 |
| 8:22 10:22 | **bachelor's** | **becoming** 84:4 | **bit** 7:16,17 94:8 |
| 11:15 40:3,7 | 16:17 | **beginning** 46:5 | **bob** 6:11 |
| 40:13 49:16,19 | **back** 12:21 | **behalf** 1:5 2:6 | **bond** 9:1 |
| 49:22 53:16 | 15:17,18,19,20 | 2:18 | **bones** 19:12 |
| 102:8 107:24 | 15:21,22 16:1 | | |
| | 16:3 18:22,24 | | |

[born - children]                                        Page 5

**born** 41:23
**bottle** 4:17,22
    60:11 61:1,9,9
    61:14 62:10,11
    62:14,17,23
    90:10,19,20,22
    90:23,24 96:24
    98:4,5,12 99:1
**bottles** 62:4
    63:8,12 64:6
    89:22,24 98:9
**bottom** 37:8
    46:16 70:7
**bought** 31:24
    62:5,8,22 64:4
    64:5,6 87:4,8
    87:11,17,20
    89:13 90:15
    91:2 100:7,8
**box** 29:13
**boy** 14:10 42:6
**bp** 34:12 59:13
    63:24 64:2
    93:8 99:9,10
    99:17
**brand** 87:14,16
    91:4
**break** 9:11,16
    64:11 93:12,14
    97:17 100:16
**bridge** 23:10
**bridged** 25:2
**bridges** 22:19
    23:11,12,17
    24:8

**briefly** 45:13
**broke** 74:11
**building** 20:7
**bulletin** 68:16
**business** 20:24
**buy** 28:8 34:11
    61:9,14 62:16
    67:16 81:7
    88:18 90:8,24
    99:21
**buying** 33:3
    61:24 87:22
    100:4

### c

**c** 28:15,15
**call** 26:1,2,9,10
    26:17,21 33:15
    56:3 103:2,22
**called** 44:19,22
**calls** 79:13
**calorie** 84:8,22
    85:7,18 109:6
**calories** 67:18
    77:18,20 78:2
    78:7,16 79:10
    80:13 81:3,19
    82:18,20
    109:24 110:1,5
**calvary** 16:21
    17:2,19
**campus** 23:2
**cans** 62:7 63:14
    63:14,16 65:23
    66:16 78:3,5
    90:9,15 99:21

99:23,24 100:8
**capital** 31:8,9
    32:4,10 37:18
**car** 32:14,17
    36:9,15 38:2,4
    38:5,8 70:20
**card** 29:8,12,13
    29:16,19 30:2
    31:1,2,3,6,11
    31:13,16,22,23
    32:2,4,7,9,10
    37:18
**cards** 31:6
**care** 54:14
**carefully**
    112:18
**cars** 32:15
**case** 5:10 6:3
    6:12 8:18
    33:16 35:1,8
    40:5 41:7
    68:12,13 69:1
    69:4,8,22
    80:20 92:17
    101:12 102:9
    105:11,16
    107:10,19
    112:20
**casey's** 28:20
    28:22
**caseyville**
    59:14 99:15
**cash** 29:16,18
    32:14

**catherine** 13:19
    13:21,24
**cause** 1:9 2:11
    5:7 112:8,11
**caused** 112:23
**cautioned**
    112:19
**ccr** 1:24 2:21
**center** 25:12,16
**cents** 61:6
    67:17 72:7
    96:24
**certain** 9:1
    29:16
**certainly** 53:12
**certified** 5:13
**certify** 112:6,7
    113:9
**change** 114:4,7
    114:10,13,16
    114:19
**changes** 115:6
**chaplain** 30:7
    30:11,18
**check** 41:14,15
**checking** 84:11
    85:15,17
**chi** 38:14
**chicago** 38:14
**chiefs** 17:6
**child** 38:15,17
    38:23
**children** 12:12
    12:15,21 14:11
    14:21 15:6

[children - convenient]                                        Page 6

38:19,22 39:3
**choice** 57:10
  84:21
**cholesterol**
  18:16,18 19:8
  83:20
**church** 66:20
**city** 2:20 12:23
  16:11 17:3,4
  17:20 22:7,12
  22:17 23:6
  99:14 112:14
**civil** 112:8
**ck** 68:4,5
**claim** 18:16
  80:19 109:14
  109:23,24
  110:4
**claims** 33:3
  68:23 69:4,8
  69:22
**clarify** 102:9
  111:6
**class** 41:7,11
  42:9,13 95:2
  101:1,5,20
  105:16 108:19
**classes** 18:1
**classified** 19:15
**clear** 85:6
**clearer** 7:5 70:8
**clerk** 74:7,9
**closely** 110:13
**closest** 28:10

**club** 28:16 29:8
  29:12
**clue** 33:2
**cnac** 37:24 38:8
**cold** 52:2 63:14
  64:12,13
**collectively**
  38:23 39:1
**college** 16:21
  17:2,20 18:3
  25:6,10
**coloquically**
  46:3
**combined**
  57:18 86:12
**come** 7:10 8:22
  35:13,16 40:8
  56:1 83:8,19
  89:10
**comes** 7:9 9:16
  61:1
**coming** 25:10
**commission**
  113:15
**commissioned**
  112:5
**commonwealth**
  39:5,12
**communicate**
  10:21
**communicated**
  40:5
**communication**
  11:23 44:10
  51:3,6

**community**
  20:9,11 22:19
  23:10,17 24:8
  25:1,3
**companies** 24:9
**company** 30:9
  35:24 36:3,4,5
  36:6 71:20
**compared**
  81:21 82:18
**complaint** 4:19
  92:16 102:19
  103:4,24 105:7
  107:7 109:14
**complete** 113:5
  115:8
**concerns** 33:3
**conclusion**
  43:13,16 79:14
**confidential**
  95:5
**confirm** 67:19
  97:18 107:6
**congratulations**
  12:5,19
**connecting**
  20:10 109:7
**conscious**
  85:17,21,22
**consent** 103:23
**consider** 80:15
  81:8
**considered**
  81:16

**consume** 73:23
**consumed**
  71:15 75:14
**consumers** 93:2
  108:12
**consuming**
  76:5 83:22
**contain** 72:21
  81:2
**contained**
  80:23 81:2,3
  107:12
**container**
  60:24 67:22
  83:3 88:19
  89:8 90:17
  97:23 98:20
**containers**
  33:12 62:4,8
  89:9 90:21
  98:2 100:12
**contains** 72:11
**content** 83:9
  84:6,9,18,22
  85:7,13,18
  109:7
**context** 46:8
**continue** 84:18
  84:23
**continued** 85:8
**convenience**
  63:13,22
**convenient**
  28:23

**conversation**
  11:5,6,12
  40:14 44:13
  45:8 52:4
  103:10
**convicted**  28:4
**cool**  90:12
**copies**  58:1
  111:21
**copy**  47:4,8
  70:8 92:20
  103:19 107:6
  111:19,20,21
**corn**  72:18,22
**correct**  17:10
  18:5 19:24
  20:19 22:11
  23:14,15 26:18
  31:19 32:12
  33:6 37:13,14
  37:16,17 39:10
  39:17,20,21
  42:2,11 48:13
  51:7,18 52:24
  53:1 58:20
  59:8,9 60:12
  61:17 62:1,2
  63:10,17 65:12
  67:10,11,24
  68:3 71:7,11
  71:14 72:17,24
  75:15,24 77:6
  77:7 78:22
  80:4,21 81:1,4
  87:14 90:16

91:6,18 99:20
  100:1,2,10
  101:3 102:21
  104:1 107:15
  107:17 108:20
  108:23 109:8
  109:11,12
  113:5 115:8
**correction**
  74:24
**corrections**
  115:6
**correctly**  48:20
  78:6 113:1
**cost**  106:23
**counsel**  3:1 5:5
  5:16 9:5,15
  111:2 113:3,4
  113:8,9
**counting**  11:14
**counts**  11:24
**county**  112:3
**couple**  102:13
**course**  84:20
  86:8,9 102:12
  111:4
**court**  1:1 2:1
  4:14 5:8,14
  6:24 7:2 13:19
  13:22,24 55:5
  55:6 69:2,3,20
  92:6 112:9,12
**court's**  69:7
**courtesy**  9:19

**courts**  10:8
  101:14
**crawford**  1:4
  1:15 2:5,17 5:4
  5:6,24 6:9
  73:10 100:24
  102:7,16,19
  104:11 109:5
  109:13 110:8
  110:19 114:1,2
  114:24 115:1,2
  115:4,12
**credit**  29:16,18
  29:19 30:2
  31:5,6 32:4,7,9
  32:12 37:18
**creditors**  37:16
**crime**  28:4
**csr**  1:24 2:22
**currently**  12:22
  21:9 24:24
  66:18
**customarily**
  28:8 67:13
**cuttermill**  3:6
**cv**  1:9 2:11 5:10
**cylinder**  90:10

| d |
|---|

**d**  14:6,8 28:14
**date**  12:3,9
  17:7 47:19
  48:24,24 50:19
  52:9,10,12,14
  52:15,16 53:21
  68:20 85:10

91:11,14
  102:18 104:13
  114:24 115:12
**dated**  47:17
  50:12 52:19,23
  102:17,19
**dates**  7:7 50:16
  99:2,6 104:24
**day**  2:21 11:3
  30:6 48:1 56:1
  111:11 112:15
  113:14 115:15
**days**  44:18
  47:21 102:1
**deal**  45:16
**dealing**  40:22
**debit**  29:18
  31:13,15,22,23
**debt**  37:24
  38:11 39:6
**deceived**  80:15
  81:9 91:12,15
**december**  46:2
  46:15 47:14,15
  47:18 48:20
  50:20 52:6,10
  52:12,19,24
  53:3 102:17
  104:18,20
  105:1
**decision**  4:14
  69:7,21 107:10
  107:12
**decisions**
  101:14

[declare - donovan]                                                        Page 8

| | | | |
|---|---|---|---|
| **declare** 115:4 | 45:11 54:19 | **differently** 75:9 | 48:2 52:12,14 |
| **deemed** 115:6 | 55:8 58:7,23 | **difficult** 7:16 | 53:3,7 54:22 |
| **deer** 36:1 | 59:1 67:2 | **difficulty** 70:11 | 68:20 69:13 |
| **defendant** 1:12 | 69:10 77:23 | **direct** 66:7 70:5 | 92:5,9 93:23 |
| 2:15,18 3:11 | 79:18 82:24 | 92:22 | 103:15,15 |
| 5:20 6:12 | 88:14,17 91:23 | **disabilities** | 104:3,12,16 |
| 91:12,15 | 93:20 95:1 | 24:10 | 107:24 |
| **defendant's** | 98:15 111:9 | **disagree** | **documents** |
| 33:4 35:4,11 | **depositions** | 109:21 | 10:3,4,6,7,17 |
| 89:16,17 | 112:7 | **discovered** | 11:14 45:14 |
| **defendants** 5:5 | **described** | 83:9 85:7 | 55:5,7,21 |
| **definitely** 23:21 | 103:3 106:24 | **discovering** | 58:22 69:20 |
| 43:20 45:7 | **designate** 95:4 | 84:22 | 70:4 |
| 47:24 51:1 | **designated** | **discussed** 49:3 | **doing** 18:1 84:2 |
| 77:14 | 95:8 | 107:23 | 85:15 |
| **degree** 16:17 | **determative** | **dismiss** 107:10 | **dollar** 60:21 |
| 16:22,24 18:8 | 88:4 | **dismissed** 69:5 | **donovan** 3:12 |
| **deny** 55:11 | **determinative** | **dismissing** 69:8 | 4:3 5:20,21 6:7 |
| 57:12 67:19 | 100:7 | 69:22 | 6:8,11 9:5,9,14 |
| **department** | **determine** | **disrespectful** | 9:15,22 36:19 |
| 30:12,22 37:21 | 85:12 | 8:17 | 36:22 40:10,15 |
| 38:13 39:6 | **developed** | **distributor** | 45:16,18,21 |
| **depending** | 87:13 | 71:20 | 51:13 53:16 |
| 53:23 72:7 | **developmental** | **district** 1:1,2 | 54:4,7,21 |
| **depends** 28:10 | 24:9 | 2:1,2 5:8,9 | 57:24 58:3,6,9 |
| **depicted** 96:22 | **diabetes** 18:12 | 92:6,7 112:9 | 58:12 64:19 |
| **deponent** 113:7 | 83:23 | 112:10 | 67:4,9 69:12 |
| 115:3 | **diabetic** 84:4 | **division** 1:3 2:3 | 69:16,24 70:1 |
| **deposed** 8:7,13 | **dierbergs** | 5:9 92:8 | 73:2,9 79:20 |
| **deposes** 6:3 | 28:12,14 89:11 | 112:11 | 82:6,10,13,14 |
| **deposition** 1:14 | **diet** 8:16 | **doctor** 18:21 | 83:2,5,8,12,17 |
| 2:17 5:4,10 | **different** 70:13 | 86:1 | 88:16 92:1,4 |
| 6:12 9:23 | 75:1,3,6,17 | **document** | 93:11,14,22 |
| 10:13,22,23 | 105:1 110:1,4 | 10:18 37:2 | 94:3 98:17 |
| 11:17,19 36:17 | | 45:22 47:22 | 100:15,24 |

[donovan - fair]                                                              Page 9

| | | | |
|---|---|---|---|
| 101:22 102:4 | **duty** 101:19 | **employed** | **excess** 56:18,19 |
| 102:13 103:6 | **dwd** 1:9 2:11 | 19:19,21 22:4 | 56:19 |
| 103:14,16,18 | **e** | **employee** 20:23 | **excuse** 21:7,21 |
| 103:21 104:9 | | 21:1 | **exhibit** 36:17 |
| 104:21 105:3,8 | **e** 20:15,17 | **employer** 41:12 | 45:11 54:19 |
| 105:14 106:9 | 28:14,14 41:24 | 41:19 | 58:7 67:2 |
| 106:15,19 | 89:8 114:3,3,3 | **employment** | 69:10 79:18 |
| 107:2,16 108:2 | **ear** 19:12,13 | 25:22 26:18 | 82:24 88:14 |
| 108:18,24 | **earlier** 39:16 | **ended** 38:17 | 91:23 93:20 |
| 109:10,16,19 | 51:13 74:11 | **enjoy** 76:14 | 98:15 104:3 |
| 110:2,11,14,20 | 77:23 88:16 | **enjoying** 86:11 | **exhibits** 4:6 |
| 111:1,5,11,14 | **easily** 98:12 | **entitled** 104:3 | 45:15 |
| 111:18 | **east** 1:3 2:3 5:9 | **entity** 49:14 | **expended** |
| **douglas** 113:14 | 13:9,11 25:22 | **equate** 71:6 | 96:21 100:4 |
| **draw** 43:16 | 26:4,18,19 | **errata** 111:13 | **expert** 107:3 |
| 104:2 | 68:6 92:7 | **error** 105:6 | **expires** 113:15 |
| **drawn** 43:12 | 112:10 | **estimate** 63:1,3 | **explain** 34:3 |
| **drink** 57:9,9 | **eating** 84:2 | 89:2,6 | 41:8 42:17 |
| 76:22 78:9 | **ed** 37:21 | **estimation** 89:3 | 101:13 |
| 82:1 86:9 94:8 | **education** | **et** 114:1 115:1 | **extent** 16:16 |
| **drinking** 75:20 | 16:16 86:7 | **everybody** | **eyes** 95:8 |
| 76:1,4,6,16,21 | **eight** 12:17 | 105:16 | **f** |
| 77:1,9,10 84:3 | **either** 113:10 | **evidentiary** | |
| 96:19 | **elaborate** 92:24 | 6:24 | **facebook** 34:22 |
| **drive** 3:14 | **elementary** | **ex** 4:8,9,10,12 | 35:1,4 40:19 |
| 59:14,19 | 20:13,18 | 4:13,14,15,16 | 41:2 42:19 |
| **driver** 70:20 | **elevate** 17:12 | 4:18,19,20,22 | 43:12 44:9 |
| **drivers** 27:2,14 | **elmwood** 3:15 | **exactly** 37:3 | 51:8,14,20 |
| 27:19,22 28:3 | **email** 47:10,11 | 47:16 | **fact** 80:13 81:5 |
| 54:11,16 | 47:13 49:7 | **examination** | **factor** 88:4,8 |
| **driving** 36:15 | 53:7,9 54:8 | 4:3,4 6:6 102:5 | 100:7 |
| **duly** 6:1 112:5 | 107:7,11 | **examined** | **facts** 72:13 |
| 112:18 | **emails** 47:23 | 112:18 | **fair** 21:19 |
| **duties** 101:5 | 54:2 | **excerpt** 95:7 | 43:11 50:13 |
| | **emergency** | | 63:7 87:24 |
| | 23:9 | | 88:1 92:19 |

97:21,24 98:1
100:6 106:20
107:4
**false**  74:13,17
80:20 101:9,10
**familiar**  68:8
**familiarity**
7:17 61:8
87:13,16 91:5
**families**  20:10
25:4
**family**  21:12,20
21:21 22:1
83:24 84:1
**famous**  70:23
**far**  28:21 43:15
65:14 66:1
80:7 90:23
94:16
**favor**  82:6
**february**  1:17
2:21 5:2 39:22
40:16 50:13,15
50:17,20,23,24
51:1,2,5,9,20
51:21,24 52:3
53:5 57:13,14
91:16,20
102:18,20
103:17 104:14
105:1,6,7
112:15 113:14
**federal**  30:3,24
31:5,17,18,22
32:11 69:2,3

**fields**  48:13
**figure**  62:24
**file**  103:23
**filed**  35:13,16
92:17,20 103:5
105:7 107:7,20
**fill**  39:18 48:12
**filling**  44:8
**finance**  39:5
**find**  40:7,17
46:9,10 54:9
59:15 74:15
89:22
**finding**  40:13
**fine**  107:21
**finish**  71:12
99:5 102:12
**finished**  25:11
**fire**  30:21
**firefighter**  30:6
30:7
**firefighting**
30:12
**firm**  42:18
46:19 48:17
**first**  6:1,17
12:7,9 14:19
14:21,24 25:5
45:24 46:13,17
48:5,10 50:22
52:17 53:17
64:21 69:16
74:21,23 75:16
75:18 76:9,16
91:11,14 92:13

92:19 107:20
112:18
**five**  18:10 22:2
56:13 93:14
100:17,22
**flavor**  86:13,14
88:2
**follow**  102:13
**following**  95:7
107:9
**follows**  6:4
**forbes**  68:9
**foregoing**
112:22,24
115:5
**forever**  86:1
**forget**  16:10
22:21 23:14
30:8 54:2
**forgot**  90:1
**form**  37:4
48:11 61:1
103:6 104:9,21
105:3,8,14
106:9,19 107:2
107:16 108:24
109:10,16
110:2,14
**formality**  9:13
**forth**  113:1
**found**  54:14
84:12
**foundation**
107:3

**four**  14:10,19
14:21 18:6,7
32:6 93:18
111:22
**fourteen**  12:17
14:18
**fraction**  106:23
**frame**  40:18
41:17 43:17
85:10
**frequent**  57:6
66:21 71:21
**friday**  11:5
**front**  98:6
**fructose**  72:18
72:22
**full**  22:15 26:15
81:13 113:4
**further**  101:22
113:9

**g**

**g**  28:14
**gallon**  4:18
61:2,9,14,18
62:3 63:9
65:11,21 89:8
89:9 90:10
97:22 100:11
**gallons**  62:7
88:17 90:15
**gap**  25:3
**gas**  28:24 34:12
49:2 57:8 64:7
66:12

[gausnell - hour]                                                    Page 11

| | | | |
|---|---|---|---|
| **gausnell** 1:21 | 45:18 56:11 | **guesswork** | **height** 17:16,17 |
| 2:19 5:11 | 58:9 64:9,19 | 46:10 | **held** 5:11 31:1 |
| 112:13 | 66:7 67:4,5 | **h** | 43:18 |
| **gelbergs** 28:13 | 69:12 70:1,2 | | **help** 26:1,2,9 |
| **general** 70:6 | 79:20 80:24 | **h** 28:15 114:3 | 26:10,17,21 |
| **germane** 8:18 | 88:17 90:24 | **half** 20:22 | 53:8 56:3 84:4 |
| **getting** 77:12 | 92:1 93:22 | 70:17,17 71:2 | 106:13 |
| **give** 6:14 7:14 | 95:2,3 | 71:2 | **hereto** 115:7 |
| 10:14 32:6 | **golf** 4:16 90:3 | **hand** 102:16 | **high** 18:16,17 |
| 56:18 62:21 | **golfer** 70:20,23 | 113:13 | 19:7 72:17,22 |
| 89:2,6 99:6 | 70:24 | **happen** 41:16 | **higher** 72:8 |
| 100:15 107:22 | **good** 5:1 6:8,10 | 88:11 | **highly** 95:5 |
| 108:17 109:2 | 47:23 73:9 | **happened** | **hills** 30:15,16 |
| **given** 113:6 | **grab** 64:8,8 | 52:21 94:23 | **hilltop** 13:11 |
| 115:9 | **grand** 25:18 | **harbor** 25:14 | 13:13,17 |
| **gives** 74:17 | **great** 3:7 86:14 | **hard** 56:21 | **hodgen** 24:19 |
| **giving** 101:10 | 86:17 | 111:21 | **hold** 32:2 |
| **glad** 54:3 | **groceries** 28:9 | **hate** 32:13 | **holding** 30:1 |
| **glass** 62:14 | 28:23 29:15,17 | **head** 7:24 | **holds** 29:19,23 |
| **go** 9:9 20:5,8 | 29:20 31:7,24 | 10:19 36:8 | **home** 56:7 |
| 23:6 37:5,15 | **grocery** 28:6,22 | 60:17 68:19 | **honestly** 76:5 |
| 39:13 57:8,11 | 29:2 61:15 | 88:24 | 82:21 92:11 |
| 58:12 61:4 | **ground** 6:21 | **health** 18:11 | 96:18 110:5 |
| 64:21 72:5 | **grounds** 8:23 | 19:8 83:21 | **honesty** 105:19 |
| 73:2 76:20 | **grunting** 7:24 | 88:7 | 105:22 106:2 |
| 81:23 90:14 | **guess** 11:4,18 | **healthier** 74:18 | **hope** 22:7,12 |
| 98:24 | 11:21,21 13:5 | 76:3,21 77:5 | 22:17 23:6 |
| **goal** 106:13 | 15:17,22 18:10 | 77:11,16,17,19 | 74:17 101:10 |
| **goals** 105:11 | 22:2,14 27:17 | 78:9,11 81:13 | **hopewell** 25:12 |
| **goes** 59:21 | 31:3 32:6 37:3 | 81:24 84:21 | 25:16 26:1 |
| **going** 6:13 7:2 | 39:24 40:23 | 86:8 106:6 | **hospital** 41:20 |
| 7:21 8:15 10:1 | 46:2,4 49:1 | **healthy** 80:23 | 41:22 42:1,10 |
| 10:20 15:9 | 63:3,4,5 64:2 | **hear** 19:16,18 | **hour** 45:10 |
| 17:11 36:19 | 81:15 89:4,5 | **heard** 68:4,6,9 | 107:22 |
| 40:4 41:14 | 94:16 107:22 | **hearing** 19:14 | |
| | | 19:17 | |

[hours - job]                                                                Page 12

**hours** 11:16
**house** 14:2 52:5
  52:5,7
**housed** 20:7
**housing** 19:22
  19:23 20:6,21
  21:3,19 22:3
  23:9
**human** 38:13
  39:6
**hunters** 13:1

**i**

**ice** 86:20
**iced** 71:2,7
**idea** 77:15
  106:4
**identifiable**
  93:1
**identification**
  36:18,20 45:12
  54:20 58:8
  67:3 69:11
  79:19 83:1
  88:15 91:24
  93:21 98:16
**identify** 5:16
  10:9 66:2 92:4
**identifying**
  67:21
**il** 2:22
**illinois** 1:2 2:2
  5:9 13:1,4,7,20
  14:4 15:18,22
  16:14 17:24
  25:23 26:20

27:9,11,19
30:15,16 34:20
36:14 39:4
54:16 55:12,14
55:24 56:7,8
56:10,24 57:4
57:7,18,19,21
59:14 92:7
99:16,17 112:1
112:5,10
113:14,19
**immediately**
  47:24
**impaired** 19:14
**important** 7:1
  7:12,22 9:4
  85:23
**imprecise**
  41:18
**improper**
  109:20
**improperly**
  29:24
**include** 57:17
  57:20
**incorrect** 50:16
  50:20,21 65:23
**index** 4:1
  111:20
**indicated** 109:5
**individually**
  1:4 2:5
**individuals**
  24:9

**inform** 9:10
  103:3
**information**
  43:22 44:1,9
  48:12,16,19,21
  48:22 49:24,24
  50:1,3,5
**ingredients**
  72:10,15
**inhaler** 19:4,5
**inhibit** 6:18
**initial** 40:14
**initially** 17:21
  18:21,23
**initials** 50:6,8
**injured** 36:11
**inside** 52:4
**instantly** 93:1
**institution**
  16:20 30:1
  31:15,23
**instruct** 40:11
**instructed** 9:3
**instruction**
  8:21
**instructions**
  6:14 8:5
**insurance** 30:9
  35:23 36:3,4,4
  36:6
**insured** 35:23
**integrity**
  105:23
**interested** 7:8
  113:11

**internet** 35:7,8
  35:10
**interrogatories**
  4:12 6:4 58:17
  58:19 59:1
  91:10
**interrogatory**
  59:11,16 64:20
  65:16,19 68:2
  91:10 104:5,6
  104:8
**interrupt** 45:13
  65:15
**intervention**
  23:19 24:7
**inventor** 71:3
**involved** 42:10
  42:12
**ip** 53:21
**irrelevant** 38:3
**issue** 33:16
**issues** 18:11
  19:8 31:15
  35:23

**j**

**jackson** 38:14
**january** 51:24
  93:8,9
**jewish** 41:20,22
  42:1,10
**job** 19:22 21:5
  21:5,6,7,8
  22:15 25:5,24
  26:12,13,19,23
  56:3

[jobs - likely]                                                                 Page 13

| | | **l** | **leading**  103:6 |

**jobs**  21:3 26:20
  56:2
**judge's**  107:9
  107:12
**judgment**
  81:17
**jug**  4:18 97:5
**jugs**  97:1
**jumped**  35:24
**june**  17:8,9

**k**

**k**  28:15
**kansas**  17:3,4
  17:20
**keep**  7:18 8:1
  33:9
**keeping**  85:14
**kenneth**  1:4,15
  2:5,17 5:4,5,24
  114:1,2,24
  115:1,2,4,12
**kept**  27:18
**kia**  32:18,19,24
**kid**  38:18
**kind**  77:21
  84:10
**knew**  76:19
  77:4
**know**  7:4 8:19
  9:13,17,18
  11:24 16:9
  20:4 32:23,24
  34:10 37:1
  38:17 39:2
  40:6 41:14

42:17,19 46:3
46:4,11,13
47:1,21 48:22
50:14,24 52:3
52:21,23 53:21
55:1,5,6 56:22
56:24 57:6,7
61:1 62:19
63:7,11 64:4,5
64:6 68:23
69:1,4,19,21
70:18 71:15
72:20,24 74:4
74:5,7 77:1,10
77:15,16 78:10
81:13,14,23
82:3,22 83:22
84:2,20 85:1
86:8,10 88:7
89:12,20,21
90:9,18 94:7
97:19,22 98:7
98:13 100:3
101:1,9 106:5
106:23,24
108:1,6,17
109:22 111:17
111:21
**knowing**  81:15
**korea**  32:21
**korean**  32:19
  32:24

**l**  20:15,17
**label**  4:21
  43:10,13 74:12
  74:19,21 76:20
  78:4,5,15
  80:16,20 84:11
  84:13 85:12,17
  86:24 87:19,23
  88:6,8 91:5
  93:24 94:12
  97:16 99:8
  101:9 106:17
  110:11
**labeled**  4:15
  72:7 77:5
  78:21 79:2,11
  80:2 81:12,21
  96:17,24,24
  98:4 106:22
**labeling**  105:12
**labels**  97:2
**large**  59:12
  60:5,7,10 61:1
  64:22 65:9,19
  66:4
**larger**  63:19
  97:1 98:5
**law**  6:22
**lawful**  6:1
**lawsuit**  41:9,12
  80:12
**lawyer**  10:21
  50:14

**leading**  103:6
  106:9 109:19
  110:3
**leads**  46:22
**lease**  84:4
**leave**  26:24
**lebanon**  26:6,7
**lee**  3:13
**left**  7:11 16:13
  37:8
**legal**  3:21 5:14
  5:15 79:13
  108:17
**legendary**  70:9
**lemon**  77:13,14
**lemonade**
  70:17 71:3,7
  75:5,11,12
  77:1,10 82:4,4
  82:18 86:12
**liaison**  20:9
**license**  27:2,8,9
  27:10,11,14,19
  27:23 28:3
  54:11,16,16
**life**  15:16 21:12
  21:20,21 22:1
  32:10 36:8
  94:23
**light**  25:15
**liked**  86:13
**likely**  33:23
  34:8 99:11,13
  104:14

**[line - manager]**

**line**  37:19
  39:18 86:20
  114:4,7,10,13
  114:16,19
**lines**  25:2
**listen**  7:1
**lite**  4:13,15,17
  4:21,22 33:4
  33:14,18 34:20
  40:23,23 56:5
  56:12,14,15,20
  57:4 60:23
  62:1,5,9 67:10
  73:13,23 74:17
  74:20,21 75:6
  75:8 76:10,19
  77:5,15 78:1
  78:22 79:2,8,9
  79:11,12,16
  80:2,9,12,16,20
  81:6,7,12,16,20
  81:21 82:3
  83:10 84:6,9
  84:18 85:13
  86:5,20 87:19
  87:23 88:2,6,8
  91:3,5 100:13
  106:5,17
  109:14,23,24
  110:4
**little**  7:16,17
  86:7 90:19
  91:19,20 95:2
  98:5 101:13

**live**  13:8,13,21
  14:5,9,19,21
  15:6,8,10
  38:19 39:19
  85:24
**lived**  13:3,9
  15:24 28:2
  39:3
**living**  13:7,17
  13:24 15:23
  16:6 17:20,22
  55:24
**llc**  1:11 2:13,19
  5:6 68:10
  112:13 114:1
  115:1
**loan**  37:22 38:8
  38:10,12
**located**  5:12
  20:1 22:8,24
  23:22 26:4
  34:14 59:13,19
  72:8
**location**  25:15
  50:2 66:15,15
  66:17
**locations**  49:1
**log**  53:20
  103:20
**long**  9:17 11:1
  11:6,12,15
  13:3,13,21
  14:5,9 20:20
  21:24 22:12,20
  23:20 24:11,20

26:9 30:18
  31:20 32:2,5
  35:24 43:2
  44:21 45:5,8
  48:2,4,8,9
  54:12,13 75:20
  89:20 96:19
**longer**  76:24
**longest**  11:5
**look**  39:12
  48:10 52:17
  53:7,12,13,16
  59:3,10 72:9
  81:18 87:2
  91:10 92:11
  100:15 110:13
**looked**  48:9
  67:14,15
**looking**  10:12
  43:6 52:18
  53:6 59:2
  72:13 77:3,21
  81:20,22,23
  83:21 84:12
  85:12,19 89:5
**looks**  53:24
**looped**  110:5
**lot**  30:5,8,10
  94:21,23
**louis**  1:3,23 2:3
  2:20 3:23 5:9
  5:12 13:9,11
  15:8,10 16:12
  18:1 20:2,18
  21:16,22 22:7

22:9,10,13,17
  23:1,6,23
  24:15,17 25:5
  25:14,20,21,23
  26:4,13,18,19
  26:23 34:17
  42:8 66:13
  92:7 99:13,15
  99:18 112:10
  112:14
**lower**  81:19,23
**lunch**  73:5
  74:12 103:9

**m**

**macoupin**
  112:3
**made**  32:21,22
  49:2 63:11
  71:19 76:20
  93:5 115:5
**main**  23:4,5
**majority**  56:2,4
**make**  7:24 54:1
  64:21 71:22,24
  71:24 81:17
  84:1 89:3
**makes**  101:14
**making**  55:22
  83:22
**man**  101:8
**management**
  23:16 68:4,5
**manager**  23:8
  23:13 24:1

[march - nearly]

march 7:16
marked 36:17
  36:20 45:11,19
  54:19,22 58:7
  67:2,5 69:10
  70:7 79:18
  82:24 88:14
  91:23 93:20,23
  98:15,18
  103:16
market 3:22
marriage 12:3
  12:7,10
married 12:1
marry 38:24
marts 28:24
matter 5:5 33:3
  44:18
matters 95:5
mean 10:10
  11:22 15:20
  60:6 70:16
  74:7 78:7
  84:15 87:2
  89:24 90:2
  101:15 106:1
  108:14
meaning 16:1
  81:12
means 108:21
meant 8:17
media 5:3 35:7
  64:17 73:7
  93:18 100:22

medication
  6:18 18:17
  19:1
medicine 77:22
memory 53:13
  53:18 55:22
mentioned
  14:11 30:24
  38:21 61:16
  74:11 77:23
  87:7,19 88:16
mentor 24:3,4
  24:6,7,12,13,14
  39:14
messages 11:24
mind 7:18 8:1
  64:10 75:2
  112:17
minute 43:4,22
  93:14 100:15
  109:2
minutes 11:9
  11:13,16,22
  100:17
miracle 77:22
misleading
  43:10,13 74:14
  74:15,15,19
  105:11 106:5
  106:22 107:1
  109:15,23
missed 9:14
mississippi
  38:14,17,19
  39:3

missouri 1:23
  2:20 5:13
  15:12,20,21,23
  15:24 16:1,4,7
  16:11,13 17:4
  17:5,20,24
  20:2 22:10
  24:3,4,6,7,11
  24:14 25:20,21
  27:10,14,18,20
  27:22 28:3,3
  33:18 34:15,20
  38:18 39:4,14
  39:19,23 54:16
  55:14,18,23
  56:1,2,5,9,13
  56:15 57:5,18
  57:19,21 66:13
  99:15,18
  112:14
mistake 34:7
mo 2:22 3:23
mobile 49:2
  66:12 99:9,12
  99:18
money 30:5,8
  30:10 42:9
  56:12 57:4
  96:21 100:4
  109:2
month 45:6,6,7
  54:13
months 12:18
  14:18 22:2,14

morning 5:1
  6:8,10
motion 107:10
move 16:3
  98:18
moved 15:17
  15:19,20,21,21
  15:24 16:14
  25:17 27:18,20
  28:1,1
moving 15:18
multiple 94:4,4

n

n 14:6,7 20:15
  20:17 28:15
  41:24
name 5:13 6:11
  10:14 14:24
  15:2 16:10
  20:12 21:18
  41:19 48:24,24
  49:4,4 55:4
  70:9 74:6,8
named 108:9
nancy 1:24
  2:21 5:15,22
  112:4
nature 8:16
  83:23
navient 37:21
navy 30:3,24
  31:5,17,18,22
  32:10
nearly 20:22

[necessarily - ounces]    Page 16

| | | | |
|---|---|---|---|
| **necessarily** 101:21 | 57:11 59:10,12 | **obviously** 30:1 | 93:12 96:21 |
| **necessary** 115:6 | 59:16,20 64:17 | **occasions** 94:4 | 97:4 98:2,22 |
| **neck** 3:7 | 64:20 68:2 | **occurred** 40:15 | 99:24 102:11 |
| **need** 9:10,16 | 73:7 81:23 | **offered** 86:19 | 102:15 103:2 |
| 111:19 | 91:10 93:18 | **offhand** 100:5 | 104:2,4,10,24 |
| **nelnet** 38:10 | 95:3 100:22 | **office** 6:22 20:5 | 105:5,10,19 |
| **never** 8:13 | 104:5,6,8 | 20:8 23:4,5 | 107:4,9,14,23 |
| 27:22 38:16 | 108:1 | 44:5,6,22 45:1 | 108:5,11 109:1 |
| 51:2 79:7,15 | **nutrition** 68:16 | 92:14 103:13 | 110:7,17 |
| 79:23 90:13 | 72:13 | 107:6,11 | 111:18 |
| **new** 52:5,5,7 | **ny** 3:7 | **offices** 2:18 | **once** 54:13 |
| 113:13 | **o** | 112:12 | 83:20 87:2 |
| **nj** 3:15 | | **official** 55:4 | 94:8,13 97:11 |
| **nodding** 7:24 | **o** 20:15,17 | **oh** 8:9 10:2,4 | 97:11,12 |
| **non** 81:7 | **o'keefe** 1:21 | 14:10 24:17 | **ones** 10:11 |
| **nonverbal** 7:23 | 2:19 5:11 | 29:23 34:1,16 | 14:16 61:16 |
| **notarial** 113:13 | 112:13 | 41:20 42:6 | 88:9 |
| **notary** 2:22 | **oath** 73:10 | 43:14 45:7 | **online** 18:1 |
| 112:4 113:18 | **oaths** 112:6 | 47:19 59:21 | **opinion** 107:3 |
| 115:13,19 | **object** 7:12,14 | 64:7,11 79:7 | **opportunity** |
| **note** 104:7 | 8:23 | 83:16 101:8 | 7:15 |
| **noted** 115:7 | **objection** 51:10 | **okay** 6:15,16 | **opposed** 72:21 |
| **notes** 100:16 | 79:13 103:6 | 7:19 8:3,9,12 | 111:16 |
| **notice** 74:21 | 104:9,21 105:3 | 8:20 9:20 | **opt** 77:12 |
| 90:7 112:8 | 105:8,14 106:9 | 11:12 12:9 | **option** 81:13 |
| **noticed** 74:22 | 106:15,19 | 17:14 19:17,18 | **options** 77:11 |
| 75:1,6,8 89:21 | 107:2,16 | 25:8 30:3,11 | **oral** 6:4 44:10 |
| 90:7 | 108:24 109:10 | 30:24 39:18 | 44:13 |
| **noticing** 75:16 | 109:16,18 | 44:24 45:17 | **ounce** 64:24 |
| **november** 12:4 | 110:2,14 | 46:3,12 53:15 | 66:16 67:9,12 |
| 12:11 | **objections** 4:10 | 56:22 58:16 | 76:11 97:8,10 |
| **number** 5:10 | 113:3 | 59:7 61:23 | 97:23 98:12 |
| 49:9 55:10 | **obligation** 101:11 | 65:3,17,24 | 99:1 100:11 |
| | **obtained** 47:4,8 | 66:2 78:20 | **ounces** 60:8,13 |
| | | 79:21 81:18 | 65:1 97:8,13 |

[ounces - plastic]

| | | | |
|---|---|---|---|
| 97:17 98:8,10 | 37:10,15 38:10 | **palmers** 75:4 | 111:11 |
| **outside** 56:2 | 39:13,18 41:2 | 76:14 80:8,14 | **perjury** 39:8 |
| 84:21 | 46:17 48:10,23 | **panel** 72:13 | 59:4 |
| **own** 20:23 | 50:6,8,10 | **paragraph** | **perry** 3:20 5:13 |
| 71:12 | 52:17,19 54:1 | 48:11 59:10 | **person** 101:24 |
| **oz** 4:13,16,20 | 58:12,14 59:4 | 92:22 93:7 | **personal** 8:16 |
| 4:22 | 59:21 64:21 | **parents** 25:3 | 41:2 94:23 |
| | 66:8 111:22 | **park** 1:22 2:19 | 95:2,5 |
| **p** | 114:4,7,10,13 | 3:15 5:12 | **personally** 8:10 |
| | 114:16,19 | 112:13 | **petition** 4:8 |
| **p** 3:12 4:8,9,10 | **pages** 10:16,17 | **part** 21:5,8 | 35:14,17 37:12 |
| 4:12,13,14,15 | 10:19 112:24 | **particular** | **petitioned** 55:6 |
| 4:16,18,19,20 | **paid** 32:13 97:2 | 86:11 | **pharmaceutic...** |
| 4:22 36:17,20 | 106:18 | **parties** 113:10 | 68:10 |
| 37:1 45:11,19 | **palmer** 4:13,15 | 113:11 | **phone** 15:9 |
| 46:14 47:5,9 | 4:16,18,20,22 | **partner** 21:5 | 49:9 70:3 |
| 48:17 54:19,22 | 33:4,14,17 | **partners** 68:6 | 107:19 |
| 58:7,9,24 66:8 | 34:19 40:23 | **party** 111:9 | **photo** 4:20 |
| 67:2,5 69:10 | 56:5,12,14,15 | **passat** 36:16 | **photos** 70:22 |
| 69:12 70:7,22 | 60:23 70:6,9 | **past** 29:7 56:13 | **physical** 11:22 |
| 72:5,10 77:24 | 70:14,18 71:2 | 61:21 | 12:23,24 15:8 |
| 78:16 79:18,20 | 71:6,16 72:1 | **pay** 36:4,5 | 16:8 26:5 |
| 82:24 83:2 | 73:13,22 74:2 | **paying** 29:17 | **physically** 18:2 |
| 88:14,18 89:13 | 74:5,12 75:8,9 | 32:13 36:6 | **picked** 76:2 |
| 90:1,2,3,5 | 75:10 76:10 | **pc** 3:5 | **picking** 76:21 |
| 91:10,23 92:2 | 77:15,24 78:21 | **pdf** 111:21 | **pill** 19:4,6 |
| 92:10,20 93:20 | 79:1,6,8,9,11 | **penalty** 39:8 | **places** 29:4 |
| 93:23 94:12 | 79:16 80:2,5 | 59:4 | 49:3 |
| 96:14,17,22 | 80:11,12 81:6 | **pending** 5:7,7 | **plaintiff** 1:7 2:9 |
| 97:7,13,23,23 | 81:7,16,20 | 9:12 112:8 | 3:3 5:18 9:8 |
| 98:15,18 99:5 | 82:3,17 83:10 | **people** 30:8 | 41:6,10 55:12 |
| 99:8,21 100:3 | 84:6,9,18 | 32:13 46:3 | 91:13 104:12 |
| 100:4,8 104:3 | 85:13 86:5,10 | 108:23 | 108:9 109:3 |
| 108:2,3 110:11 | 86:20 100:13 | **period** 57:1 | **plastic** 62:14 |
| **pacific** 68:6 | | 94:14,20 | 62:15,17,23 |
| **page** 4:2 21:16 | | | |
| 21:22 37:5,7,7 | | | |

[plastic - prompted]

Page 18

| | | | |
|---|---|---|---|
| 63:8,12 | **prefilled** 48:11 | **primarily** | 62:22 63:8 |
| **platform** 35:7 | 48:22 | 106:3 | 64:23 65:10,11 |
| **please** 5:17,23 | **preparation** | **primary** 19:22 | 65:13,20 66:3 |
| 17:15 20:16 | 59:1 | 21:6,7 | 67:10,14,16,17 |
| 48:12 57:11 | **prepare** 8:21 | **prior** 10:22 | 67:22 68:1 |
| 58:13 70:3 | 9:23,24 10:12 | 13:7,17,24 | 72:6,10 73:14 |
| 82:6 | 10:22 11:16 | 22:3,17 23:17 | 73:23 74:2,5 |
| **point** 7:10 43:5 | 55:8 | 24:2,14 27:17 | 74:16,18 76:13 |
| 43:7,22 44:8 | **preparing** | 31:2,5,22 | 77:3,4 78:1 |
| 53:14 54:15 | 11:19 | 44:14 47:15,21 | 79:2,9,22 83:3 |
| 67:5 83:8 | **present** 61:20 | 48:17 51:2,4 | 84:19,23,24 |
| 87:21,22 | 108:16 | 85:11,20 87:22 | 85:7,8 86:4,5 |
| **points** 102:10 | **presently** 29:14 | 109:7 | 86:22 87:5,8 |
| **portion** 36:5,6 | **presume** 7:3 | **priority** 86:2,3 | 87:11,17,20,23 |
| 70:7 82:8 | **pretty** 15:15 | **privilege** 8:23 | 88:18 89:8 |
| 83:14 | 25:2 36:7 | **privileged** 40:6 | 90:18 91:3,3 |
| **posed** 7:13 8:24 | 47:23 52:2 | **probably** 32:22 | 91:13 93:8,24 |
| **position** 23:14 | 74:20 76:18 | 48:1 57:19 | 94:12 96:17,22 |
| 26:15 | 86:12 91:8 | 74:24 75:18 | 97:15 98:20 |
| **possible** 45:14 | 101:8 | 84:10 86:18 | 99:3,8 100:4 |
| 52:22 53:2 | **prevent** 84:4 | 94:9 98:10 | 104:13,19 |
| 105:5 106:22 | 105:11 | **problem** 93:13 | 105:20 106:17 |
| 107:14 | **preventing** | 100:18 | 106:18,21 |
| **posted** 34:24 | 85:11,19 | **proceed** 51:11 | 109:7 110:9 |
| 35:3,6,10 | **previous** 41:12 | **proceeding** | **products** 33:4 |
| **pounds** 17:18 | 61:19 | 6:13 | 35:4,11 66:22 |
| **prange** 1:24 | **previously** 11:4 | **proceedings** | 72:20 81:21 |
| 2:21 5:15 | 50:17 66:9 | 101:12 | 86:20 89:17 |
| 112:4 | 78:20,23 90:14 | **process** 80:17 | 92:23 97:21 |
| **predominant** | 109:5 | **produce** 29:3 | **program** 21:14 |
| 88:8 | **price** 59:24 | **product** 33:5 | 23:8 24:1 |
| **prefer** 90:23 | 60:18 61:5 | 33:16 40:24 | **promised** 109:2 |
| **preference** | 67:17 72:6 | 55:11,13 57:13 | **prompt** 48:13 |
| 63:16 | 89:12 106:20 | 59:13 60:5,22 | **prompted** |
| | | 61:24 62:1,5,9 | 35:21,22 |

| | | | |
|---|---|---|---|
| **proper** 13:9 | **purchased** 29:3 | 49:23 53:18,19 | **quite** 61:11 |
| **proposed** 101:1 | 34:19 49:2 | **putative** 41:6 | 94:8 |
| 108:19 | 55:11 57:12 | 42:15 95:2 | |
| **propounded** | 59:24 61:2 | | **r** |
| 6:4 113:3,6 | 63:9 65:18 | **q** | **r** 14:6,8 20:15 |
| **proud** 108:12 | 66:22 67:13 | **qualified** 112:5 | 20:17 28:14,14 |
| **provide** 7:23 | 72:6,21 73:22 | **quantity** 67:23 | 41:24 114:3,3 |
| 43:22 44:1 | 74:1 76:10 | **quench** 86:22 | **race** 70:20 |
| 48:16,21 49:7 | 78:1,21,23 | 91:4 | **raise** 17:11,12 |
| 49:24 53:20,22 | 79:5,7,10 80:5 | **quenched** | **rampantly** |
| 54:3 | 80:11,14 81:6 | 87:10 | 83:24 |
| **provided** 43:24 | 88:22 89:1,7 | **question** 7:1,2 | **ran** 35:23 |
| 48:12 49:4 | 90:18 93:24 | 7:3,4,6,13 8:24 | **rather** 75:7 |
| 50:1,3,5 53:24 | 94:11 97:1,7 | 9:12,17 29:24 | 77:12 |
| 107:6 | 97:10,11,12,22 | 35:15 41:18 | **rauckman** |
| **provides** 30:2 | 98:20 99:2,7 | 51:12 52:11 | 59:13,19 63:24 |
| **proximity** | 100:13 104:18 | 57:20 62:6 | 64:3 99:11,16 |
| 66:18,20 | **purchasers** | 65:7,8 66:2,3 | **reached** 27:10 |
| **public** 2:22 | 105:20,23 | 70:13 80:10,18 | **read** 68:15 69:7 |
| 24:15,16,17 | **purchases** 33:8 | 81:5 83:11 | 70:7 82:7,9 |
| 25:5 26:23 | 49:2 55:17,18 | 91:11 101:17 | 83:12,15 108:5 |
| 112:4 113:18 | 55:23 56:4,16 | 106:11 | 108:8,11,14 |
| 115:19 | 57:18,21 65:14 | **questioned** | 115:5 |
| **purchase** 33:14 | 106:4 | 41:15 | **reading** 70:11 |
| 33:17 60:22 | **purchasing** | **questions** 6:7 | **reads** 91:11 |
| 63:11 66:3,16 | 28:11 36:2 | 6:15,19 7:7,21 | **really** 11:24 |
| 67:23 73:13 | 55:13 59:11,12 | 8:15,15 9:1,3 | 28:23 30:17 |
| 74:5 76:13 | 77:4 88:5 93:7 | 40:4 43:1,3,6 | 56:21 72:23 |
| 78:14 79:1 | 96:14,17 97:5 | 55:17 102:3,6 | 81:14,16 87:2 |
| 83:3 84:19,24 | 98:3 104:13 | 102:9 113:2,6 | **reason** 8:24 |
| 85:1,8 88:4,13 | **purposes** 33:15 | **quick** 100:16 | 74:19 76:15,23 |
| 89:10,15,16 | **pursuant** 112:7 | **quiktrip** 28:18 | 77:8 91:7 |
| 90:11 94:19 | **put** 18:21,23 | 28:21 33:23 | 100:6,7 114:6 |
| 97:15 99:24 | 39:19 49:4,13 | 34:8,10,12,14 | 114:9,12,15,18 |
| | 49:15,18,19,21 | **quiktrips** 63:24 | 114:21 |
| | | 64:1 | |

[reasonable - resolution]                                                          Page 20

| | | | |
|---|---|---|---|
| **reasonable** 7:9 | **recognized** | **regards** 91:13 | **reported** |
| 62:21 | 92:24 | **regular** 75:5,10 | 112:23 |
| **reasons** 87:4,8 | **recollection** | 75:11,12 78:13 | **reporter** 5:14 |
| 87:11,16,20 | 110:8 | 79:11 111:21 | 7:22 82:9 |
| **recall** 10:16 | **record** 5:2,17 | **reinstated** | 83:15 |
| 33:21 34:3,6 | 8:1 9:9 53:18 | 27:22 | **represent** |
| 40:21 44:17 | 53:19 64:14,16 | **related** 18:11 | 105:20,23 |
| 45:5 48:9 59:2 | 73:2,4,6 82:9 | 113:11 | 106:2,13 |
| 60:15 68:5 | 83:15 85:6 | **relation** 68:12 | 108:12,17 |
| 69:18 74:3 | 93:15,17 | 68:13 | **representation** |
| 75:16 76:8 | 100:19,21 | **remarks** 113:3 | 43:6 102:17 |
| 78:3,18 85:1,9 | 110:23,24 | **remember** | 104:17 107:24 |
| 89:14,15 91:14 | 111:1 | 10:12 13:15 | **representative** |
| 92:13,16 94:10 | **recorded** 5:3 | 14:2 16:8 23:3 | 95:3 101:5,20 |
| 96:20 97:2 | **refer** 46:3 91:9 | 23:4,13 26:5 | **representing** |
| 102:22 104:12 | **reference** 79:12 | 27:5 40:21 | 108:21 |
| 107:5,9,11,13 | **referencing** | 45:24 46:5 | **request** 55:10 |
| 107:18,21,23 | 68:1 | 48:20 52:2,3 | 57:12 |
| 108:4 | **referred** 39:16 | 60:14,16 68:20 | **requested** 82:8 |
| **recap** 91:2 | 48:22 51:13 | 74:13 78:6,15 | 83:14 |
| **receipts** 33:7,9 | 66:9 | 83:18 88:24 | **requests** 4:10 |
| **receive** 41:13 | **referring** 37:19 | 89:7 94:21 | **required** |
| 47:13 48:13 | 64:23 65:4,9 | 96:19 98:2 | 115:13 |
| **received** 41:14 | 65:10,15,16,19 | 103:10 | **reservation** |
| 42:9,18,21 | 65:20 66:5 | **remembered** | 111:5 |
| 43:11 47:22 | 67:12 95:6 | 103:9 | **reserve** 111:7 |
| 51:8,16 | **refers** 37:15 | **remiss** 8:9 | **reserving** 111:2 |
| **receives** 111:9 | 39:13 46:19,22 | **remotely** 18:4 | **reside** 12:22 |
| **receiving** 48:17 | 59:10 66:12 | **rendering** 93:1 | 13:18 14:1,12 |
| 107:11 | 93:7 | **repeat** 51:12 | 14:17 15:12 |
| **recently** 11:4 | **refresh** 53:13 | 83:11 105:21 | 52:7,8 |
| 88:5 | **refreshes** 55:22 | 106:11 | **residential** 24:5 |
| **recess** 64:15 | **refreshing** | **rephrase** 65:7 | **residing** 39:22 |
| 73:5 93:16 | 53:17 | **reply** 6:4 | **resolution** |
| 100:20 | | | 106:7 |

[resources - services]                                              Page 21

| | | | |
|---|---|---|---|
| **resources** 20:11 | **retainer** 4:9 | **run** 83:24 | **seal** 113:13 |
| **respect** 62:3 | **retaining** 44:14 | **rush** 111:19 | **seated** 7:11 |
| 88:2 100:3 | **review** 10:3,4,6 | **rx** 79:5 | **second** 12:8 |
| **respects** 113:4 | 48:2,4,5,8 | | 37:6 48:10 |
| **respond** 42:24 | 58:22,24 89:19 | **s** | 58:14 59:3,21 |
| **responded** | 111:3,11 | **s** 28:14,15,15 | 67:7 72:5 73:3 |
| 42:23 43:21 | **reviewed** 10:7 | 41:24 114:3 | 74:24 |
| 51:17,19 | 11:15 55:7 | **sacrifice** 102:2 | **see** 36:24 46:20 |
| **responding** | **reviewing** | **salvation** 25:11 | 46:23 48:14 |
| 47:23 | 92:16 | 25:13 | 50:12 53:6 |
| **response** 44:9 | **right** 9:15 13:5 | **sam's** 28:16 | 55:14 57:15 |
| 44:13,16 59:11 | 19:13 24:21 | 29:8,12 | 59:5,14,20 |
| 59:17,20 65:18 | 25:24 33:5 | **saved** 30:5,7,9 | 60:1 61:5 66:3 |
| 68:2 82:15 | 34:5 58:17 | 53:23 | 66:10,13 67:6 |
| 104:6 | 59:5,8 61:19 | **saw** 40:19 | 67:18 78:16,17 |
| **responses** 4:10 | 67:7 70:18 | 46:14 69:17 | 78:18 90:12 |
| **responsibilities** | 72:1 73:11 | 77:5 | 91:16 93:2 |
| 108:6,8 | 81:3 84:2,3,3 | **saying** 51:19 | 98:19 |
| **responsible** | 91:2 97:8,13 | 78:2,16 90:22 | **seeing** 45:24 |
| 49:11,14 | 101:2 111:3,7 | 97:7,10 | 78:15,18 92:13 |
| **rest** 36:8 | **rights** 111:2 | **says** 6:3 38:14 | **seen** 45:21 |
| **restaurant** | **river** 3:14 | 47:17 48:11 | 54:22 55:20 |
| 71:22 | **road** 3:6 | 59:24 61:6 | 69:13 79:15,22 |
| **restaurants** | **robert** 3:12 | 74:17 92:6 | 79:23 90:11,13 |
| 71:21 80:7,14 | 5:20 | 104:12,18 | 92:9 |
| 81:8 82:2 | **robert.donovan** | 106:17 108:5 | **sense** 57:3 |
| **restroom** 9:11 | 3:17 | 108:12 | **sent** 10:7 44:6 |
| 64:10 | **role** 24:23 | **schnucks** 28:11 | 44:12 53:2,4,9 |
| **result** 36:11 | **room** 64:12 | 28:14 89:10 | 92:15 |
| 42:9 | **root** 17:5 | **school** 17:23 | **separate** |
| **resumed** 76:7 | **roughly** 56:9 | 20:7,10,12 | 109:23 |
| 76:19,23 77:4 | **route** 36:14 | 21:13,13,14 | **serious** 88:7 |
| 77:8 | **rules** 6:21 | 24:16,17 25:4 | **services** 23:19 |
| | 111:2 | 25:4 26:23 | 24:2,8 30:7 |
| | | **schools** 24:15 | 38:10,13 39:6 |
| | | 24:17 25:5 | |

[set - spare]

**set** 44:23,24
113:1
**seven** 12:15,21
38:21
**shape** 90:4
**sheehan** 3:4,5
4:4 5:18,19 9:7
9:8,21 36:21
40:3,7,9,12,13
44:10,12,14,19
45:4,9,13,17,20
47:12 48:16
50:14,18,22
51:3,6,10 52:4
53:2,19 54:5
58:2,5,11
64:13 66:9
69:14 79:13
92:3 93:13
94:1 100:18
102:3,6,7
103:15,17,19
103:22 104:10
104:11,24
105:5,10,15
106:10,12,16
106:21 107:4,5
107:18 108:3
109:1,12,17,21
109:22 110:7
110:17,18
111:4,8,12,16
111:19
**sheehan's**
42:18 44:4,6

46:19 50:12
92:14
**shiloh** 13:1,3,5
13:7
**shop** 28:16
29:1,15,17
**shopping** 28:6
28:22 29:2
**shorthand**
33:15 112:23
**show** 36:19
45:18 53:20
54:21 58:9
64:9 67:4
69:12 72:9
79:20 83:2
88:17 92:1
93:22 98:17
**showed** 10:10
77:24 110:11
**shown** 112:21
**shows** 59:18
70:22
**side** 86:10
**sign** 52:15,16
111:3
**signature** 37:8
37:10 46:16,18
47:17 50:10,12
52:9,10 53:4
58:13 102:18
113:7,16
**signed** 47:19,22
48:1,3,6 53:3
53:21 59:7

102:23 103:1
103:11,14
104:17
**similar** 29:13
104:7
**similarly** 1:5
2:6
**sir** 8:17 10:1
11:20 12:1
16:16,24 21:11
36:19 37:15
45:19,22 48:10
52:17,22 58:10
67:5,9 69:13
70:4 79:6 83:3
92:2 93:23
94:22 101:22
110:21
**sitting** 98:6
**situated** 1:6 2:7
**six** 12:17 14:18
**size** 61:2 62:11
65:5 67:22
90:17,23 91:1
98:20
**sized** 59:12
64:22 65:9,20
66:4
**slightly** 17:13
**small** 62:23
106:23
**smaller** 62:10
62:11,16 63:8
63:12 90:19,24
96:24

**social** 35:7
**soda** 76:5 77:1
77:6 78:13
**sold** 80:1
**solutions** 3:21
5:16
**soon** 44:16 45:3
**sorento** 32:18
**sorry** 5:7 14:20
15:19 16:19
18:15,22 19:5
20:5 21:18
23:12 29:23
34:2,5,7 35:15
35:24 40:1
41:21 44:22
47:6,7 48:24
49:15 50:19
51:4,12 52:22
58:18,23 59:19
62:6 65:4,6,15
65:22 75:10
78:23 79:8
80:17 85:4,9,9
88:21 98:11
101:15 105:21
106:11
**sound** 112:17
**sounds** 68:8
**south** 25:18
**southern** 1:2
2:2 5:8 92:7
112:10
**spare** 86:16

[speak - sure]

speak  10:1 11:1
11:10 44:23,24
45:3 85:5
102:24 111:6
speaking  11:15
61:19 103:13
specialist  5:14
25:1
specific  81:24
speeding  27:13
spell  20:16
spencer  3:4,9
5:18 9:7 47:12
58:1
spencersheeh...
3:9
spencersheeh...
46:22
spent  56:12,15
56:24 57:4
spoke  10:21
50:18,22
102:22 107:19
107:20
spoken  103:12
ss  112:2
st  1:3,23 2:3,20
3:23 5:9,12
13:9,11 15:8
15:10 16:12
17:24 20:2,18
21:16,22 22:7
22:9,10,13,17
23:1,6,23
24:15,17 25:5

25:14,20,21,22
26:4,13,18,19
26:23 34:17
42:8 66:13
92:7 99:13,15
99:18 112:10
112:14
stance  101:9
standard  111:8
111:13,20
stands  32:24
33:1,2
start  6:15 8:14
37:6 76:9
96:16,18
started  76:5,16
83:21 95:1
starting  48:23
92:11
state  2:20 27:8
34:20 39:19
50:17 55:11,13
69:1 91:11
112:1,5,14
113:19
stated  106:3
statement  60:3
72:9,15 93:9
108:11 110:10
states  1:1 2:1
5:8 92:6 95:3
112:9
stating  103:10
station  49:3
59:13 66:13,21

99:12,17,18
stations  28:24
34:12 93:8
stevens  3:13
stevenslee.com
3:17
stock  63:14
stop  56:6 57:7
64:7 76:4
stopped  61:24
76:1,6 96:14
104:13
store  29:13
49:23 61:15
66:12 74:7,9
stores  57:6
63:13,22
story  35:24
street  3:22 14:3
16:9,9,10
21:22 23:3,5
26:6
strike  43:23
44:7
student  37:22
38:12
studies  16:23
studying  17:19
stuff  111:13
subject  80:12
submission
44:12
submitted  44:3
subscribed
115:14

substantially
104:7
sue  43:6
suffer  18:11
sugar  72:11,16
72:21 78:10,12
82:1,11,14,15
82:16 83:9
84:6,17 85:13
109:6,24 110:1
sugars  81:14
83:23
suggesting
109:20
suit  113:10
suite  3:6,14,22
supervisor  24:5
support  22:19
23:10,17 24:8
25:1 38:15,18
supposed  38:16
sure  10:18 11:2
21:17 37:20
38:1 39:7,11
42:20 43:17
47:16 54:1,5
55:4,18 56:17
56:23 57:2
58:5 60:7
62:13,18 64:11
64:22 68:13,19
70:10 71:5
72:23 82:21
83:22 84:1
92:14 93:13

94:6,7 96:16
97:22 98:23
100:18 101:6
103:21
**surgery** 19:9,11
**suspended** 27:2
27:8,11,12
54:12,12
**swansea** 13:19
14:4 36:14
**swear** 5:23
**sweet** 75:4,9
77:12 80:5
82:17
**sweetened**
82:17
**sweetener**
72:17
**swore** 39:8
**sworn** 6:1 59:4
112:19 115:14
**syrup** 72:18,22

**t**

**t** 114:3,3
**take** 9:11 11:16
18:22 19:1,4
32:6 43:2 48:8
53:7,13 57:24
64:11 70:2,3
93:11 100:16
**taken** 1:20 2:18
5:4 18:23
**talk** 86:4
**talked** 46:6

**talking** 11:8,19
44:17 60:23
61:21 79:6
111:15
**taste** 75:1,2,3
86:11 87:4
91:3
**tasted** 75:9,16
**taxes** 72:8
**tea** 40:22 64:8
70:17 71:2,7
75:4,9,10 77:1
77:9,11,12,13
78:13 80:5
82:3,17 86:8,8
86:11,20
**teacher** 24:22
**tech** 24:19
**technical** 10:14
**technically**
60:20
**telephone**
102:23,24
103:2,22
**tell** 8:14 10:11
12:16 14:16
30:8 36:22
55:21 58:13
62:11 63:23
70:6 72:10
75:20 86:6
94:11,16 99:2
99:5,7 103:23
**telling** 50:19
95:1

**ten** 14:18
**tend** 101:19
**tense** 61:20,22
**term** 70:14
**terms** 11:16
29:17 43:15
55:20 67:21
**test** 9:19
**testified** 78:20
80:22 90:15
99:20 112:21
**testify** 6:2
101:8 112:19
**testifying**
101:18
**testimony** 6:22
74:13 95:7
112:22 113:1
115:8
**thank** 5:22 8:10
12:6,20 17:15
19:19 36:21
40:12 45:17,20
54:4 58:2,6,11
64:13 69:14,24
70:4 83:7 92:3
94:1 100:18
101:23,24
102:7 103:18
110:19,20
**thanks** 111:14
**thereto** 113:4
**thing** 8:14 57:2
57:8 84:1,2
89:15 111:9

**things** 11:8
29:4 56:6
83:21,23 84:3
84:3 90:12
94:21,23 103:4
103:9 105:2
**think** 18:21
24:13 25:1,9
34:5,21 37:20
55:16 56:15
78:6 82:16,17
85:15 86:5
98:9 101:11,19
103:12 106:6
106:20
**thinking** 76:21
**third** 37:7,7
67:18 78:1,7
78:16 79:10
80:13 81:6
110:10,12,15
**thirst** 86:22
87:10 88:2
91:4
**thomas** 1:21
2:19 5:11
112:13
**thought** 34:1
53:23 54:6,9
74:12 76:2
80:4,22,24
81:3 85:24
106:5
**three** 13:15,23
14:15 24:8,21

[three - usually]

73:7
**ticket** 27:13
**tim** 5:13
**time** 7:11 8:22
9:16 11:2 18:2
21:5,8 22:15
25:19 26:13,15
35:13,16 36:16
40:18 41:13,17
43:15,17,23
45:24 46:13
50:22 54:15,17
57:1 64:17
69:16 73:7
74:23 75:1,18
76:9,24 79:1
83:9 84:10,15
85:10,16,16
88:12 89:21
92:19 93:18
94:14,21,24
96:20 100:22
101:23 107:19
**times** 7:8 18:3
28:2 57:13,17
57:22 62:16,22
88:22,23 89:1
94:4,5,11
**timothy** 3:20
**title** 23:14,15
24:24
**today** 6:13 9:23
11:10
**together** 110:6
113:2

**told** 11:14,21
83:20 86:1
**took** 43:21
54:14 87:2
88:8
**top** 10:19 46:20
60:17 68:19
88:24
**totally** 109:20
**town** 16:11
99:14
**tract** 96:13
**transcribed**
7:22 112:23
**transcript**
111:10 112:22
113:5 115:5,8
**traumatic**
94:20,22
**trial** 112:11
**true** 59:8 60:3
79:12 85:18
91:18 93:9,10
105:2,4 106:4
113:5 115:8
**trust** 9:19
**truth** 6:2,2,3
112:19,20,20
**try** 7:5,15
32:12 70:8
94:20 105:11
**trying** 11:7
23:13 25:9
59:15 60:14
77:10 80:17

87:10 101:15
**turn** 70:3 83:7
104:5
**twice** 94:9,10
**two** 13:15
15:17,22 24:13
31:4,21 34:12
36:1,2 38:22
39:1 64:17
82:19 104:24
**type** 23:7 32:17
71:13,16
**typewriting**
112:24
**typically** 29:21
34:4,11 57:8
64:7 89:9
**typographical**
105:6

| u |
|---|

**u** 28:15
**u.s.** 32:22
**unclear** 8:1
**under** 6:18
22:21 39:8
43:4 55:10
59:4,16,20
72:15 73:10
111:2
**understand** 7:4
7:6 8:4 9:2
64:22 73:11
80:10 101:1,4
102:1 109:17

**understanding**
46:9 80:19
110:8
**understood** 7:3
67:21
**undetermined**
112:9
**unique** 92:24
**unit** 5:3 64:17
73:7 93:18
100:22
**united** 1:1 2:1
5:8 92:6 112:9
**unloaded** 45:15
**unpaid** 27:13
**unsure** 55:18
**unsweet** 77:13
82:3
**unsweetened**
82:4
**ups** 102:13
**usa** 1:11 2:13
5:6 114:1
115:1
**use** 29:16,19
31:6 32:4,12
34:13 64:3,10
**used** 112:11
**using** 32:5
**usually** 28:11
29:17 53:22
72:6

[v - yeah]                                                          Page 26

| v | | | |
|---|---|---|---|
| **v**  114:1 115:1 | **villa**  30:15,16 | 81:19 88:12 | 112:17 113:2,7 |
| **vague**  29:24 | **voice**  17:11,12 | 94:15,22 98:18 | 113:13 |
| **value**  6:24 | **volkswagen** | 106:22 | **witnessed**  74:4 |
| 63:20 86:15,16 | 36:16 | **we've**  55:20 | **wives**  38:22 |
| 87:7 88:3 91:4 | **voluntarily** | **website**  45:15 | **woodward**  14:5 |
| **values**  86:19 | 26:24 | 47:2 49:23 | **words**  49:20 |
| **vehicle**  32:19 | **volunteer**  30:6 | 89:17,19 90:12 | **work**  11:7 20:9 |
| 35:22 36:2 | 30:21 | **week**  94:9,10 | 21:12,13 22:18 |
| **verbal**  7:23 | **vs**  1:9 2:11 | 94:13 97:11,11 | 22:20 23:7,18 |
| 11:23 | | 97:12 104:19 | 23:20 24:9,11 |
| **verbatim**  40:21 | w | | **weekly**  59:13 | 24:14,20 25:13 |
| **veritext**  3:21 | **w**  14:6,6,7,8 | 66:1,24 67:13 | 26:9 42:3 56:1 |
| 5:15 | **wait**  7:12 8:24 | **weeks**  36:1,2 | 66:19 |
| **version**  33:15 | 9:4 | **weigh**  17:17 | **worked**  23:2 |
| 59:12 60:5 | **waived**  113:8 | **weight**  17:16 | 25:9,12,14,17 |
| 64:23 65:10,20 | **walk**  36:7 | **weird**  30:17 | 25:18 26:1,10 |
| 66:4 | **walmart**  28:11 | **went**  44:4 | 66:19 |
| **versions**  110:9 | **want**  6:14 8:9 | **wife**  14:19,22 | **working**  20:20 |
| **versus**  5:6 | 8:14,18 9:5 | 29:12 | 21:2,24 22:3 |
| **veteran**  30:4 | 36:7 40:10 | **wife's**  14:24 | 22:12 23:17 |
| **video**  5:3,14 | 61:2 64:21 | **winward**  14:3 | 25:11 26:12 |
| 83:5 110:22 | 72:1 83:6 85:6 | 14:6,8 | 41:17 |
| **videographer** | 104:2 105:15 | **wish**  32:13 | **worldwide** |
| 3:19 5:1,22 | 111:7 | 102:13 | 92:24 |
| 64:14,16 67:6 | **wanted**  72:2 | **wit**  6:5 | **worry**  58:3 |
| 67:7 73:4,6 | 81:24 84:1 | **withdraw** | **write**  55:12 |
| 83:6 93:15,17 | **watching**  84:11 | 52:11 58:23 | **writing**  44:1 |
| 98:19 100:19 | **water**  77:2 | 65:7 101:17 | **written**  44:16 |
| 100:21 110:22 | 84:21 90:20 | **withdrawn** | **wrong**  72:17 |
| **videotape**  1:14 | 98:5,9 | 43:23 44:7 | 75:24 80:4 |
| 2:17 | **way**  7:10 8:9,11 | 68:24 75:7 | 99:20 |
| **videotaped** | 13:1 14:3,5 | 78:14 82:13 | y |
| 7:20 | 15:15,16 29:16 | **witness**  5:23 | **yeah**  19:15 |
| | 53:23 56:7 | 9:10 40:11 | 22:23 27:7 |
| | 68:12 70:13 | 83:13 109:19 | 29:3 30:9,17 |
| | 77:17,19 81:18 | | |

**[yeah – young]**                                                                      Page 27

34:11 40:2,12
47:20 50:21
52:21 56:23
57:6 61:13,13
64:7,13 72:2
74:14 85:14
86:14,16 87:3
90:6,9 91:19
91:19 94:9
111:12,16
**year**   11:18 13:6
  16:24 18:8
  20:22 22:21,22
  23:21 26:11
  30:20,22 31:1
  43:18,18,20
**years**   13:16,23
  14:10 15:17,22
  17:23 18:6,9
  19:9 24:13,21
  31:4,21 32:3,6
  41:13 56:14
  75:22 94:15
**young**   36:7
  85:24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.